# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-04-00401-CR

**Shane Allen Saunders, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 04-241-K368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

The opinion and judgment dated August 18, 2006, are withdrawn, and the following is substituted in its place.

A jury found appellant Shane Allen Saunders guilty of engaging in organized criminal activity, found the deadly weapon allegation in the indictment "true," and assessed punishment at life imprisonment. *See* Tex. Penal Code Ann. § 71.02 (West Supp. 2005). Saunders asserts that the evidence is legally and factually insufficient to sustain the guilty verdict. He also complains that the indictment should have been quashed, and that the court erred in admitting irrelevant and unreliable expert testimony regarding the results of gunshot residue tests. We will overrule these issues and affirm the conviction.

**Background**

Around 3:00 a.m. on July 22, 2002, law enforcement officers responded to reports of gunfire and a high-speed automobile chase in a Georgetown residential neighborhood. Officers set up a roadblock and stopped two speeding vehicles: a white Chevrolet pickup truck driven and solely occupied by Kimela Trump, and a red Mazda driven and solely occupied by Shawn Forrest. Forrest, who was bleeding from an injury on his hand, told the officers that someone in the white truck had been shooting at him. Numerous bullet holes were found in the front and side of the Mazda. There were no bullet holes in the Chevrolet pickup truck.

*Participants' Testimony*

Forrest testified that a stranger came to the door of his apartment at about 2:00 a.m. on the night in question and asked for "James." Forrest told the man "there is no James here" and ordered him to leave. As the man walked away, Forrest noticed figures moving about in the dark, one of whom ran to a pickup truck parked in a neighboring parking lot. Forrest left his apartment, got into his car, and drove toward the suspicious pickup. He could see a figure inside the pickup, but was unable to tell the person's gender. The pickup truck left the parking lot and began to drive away. Forrest followed. Suddenly, the truck stopped and a figure at the side of the street stepped into the light with an arm extended. Gunshots rang out, causing Forrest to duck down in his car. He heard bullets striking his vehicle and felt something graze his hand. After the shooting stopped, the pickup sped away. Forrest pursued, chasing the pickup through the neighborhood until both vehicles were stopped at the police roadblock.

Forrest recognized Trump when she got out of the pickup. She was the girlfriend of David Maynard, a leader of the Aryan Brotherhood of Texas, a prison-based gang. Forrest acknowledged being a member of the group. He testified that earlier that year, he had refused to obey Maynard's order to transport a load of methamphetamine.

While some officers dealt with Forrest and Trump at the roadblock, other officers began searching the area where the shots had been fired. Reports had been made about a person or persons running through yards in that neighborhood. The officers were looking for appellant Shane Saunders, whose driver's license and ATM card had been found in the white pickup. At 7:00 a.m., Saunders and Wayne Confer, another Aryan Brotherhood member, were found walking in the area and were taken into custody. Both men were perspiring heavily and covered with dirt and grass burrs.

Shortly after Saunders's arrest, Detective Bill Pascoe of the Georgetown Police Department conducted a custodial interview of Saunders who stated that he had nothing to do with the shooting. When asked whether he was a member of the Aryan Brotherhood, Saunders replied "kinda sorta." A series of recordings of telephone conversations between various members of the Aryan Brotherhood were admitted during trial. In the recorded conversations, Maynard and Confer discussed Saunders and his role in the Aryan Brotherhood, talking about "putting [Saunders] to the test." During another call, Trump told Maynard that, when she discussed the planned hit on Forrest with Saunders, he "knew plenty about it."

In a recorded conversation after the shooting, Saunders and Matthew Cox, a "probationary" Aryan Brotherhood member, discussed attempting to evade capture by police after the shooting and wiping down the weapons used during the shooting. In another conversation

3

between Saunders and Confer's girlfriend Christina Allen, Saunders stated that he and various other gang members who were directly or indirectly involved in the shooting were going to get a new tattoo. Finally, Saunders told another Aryan Brotherhood member that he had told the police a "b[]s[]" story about getting drunk and not knowing where he was.

Confer gave several statements to the police. He admitted membership in the Aryan Brotherhood and ownership of the white Chevrolet pickup truck. He said that Maynard, in a series of telephone calls, had ordered him to collect $800 from Forrest. The jury heard recordings of these telephone calls, made by Maynard from the Travis County jail.[1] On July 22, Confer drove to Forrest's apartment, accompanied by Trump, Saunders, and Cox. Confer knew that Trump, Saunders, and Cox were armed, but he denied having a weapon himself. Confer said he sent Saunders and Cox to Forrest's door to ask for "Shawn." Confer said that he was standing in the parking lot as Forrest left his apartment, got into his Mazda, and followed Trump when she drove away in Confer's truck. Confer told the police that he saw Saunders and Cox shoot at Forrest's Mazda. Confer denied firing any shots that night, saying that he "jumped down" in the grass when the shooting started.

Trump testified that she became romantically involved with Maynard after he was released from prison in February 2002. Through her involvement with Maynard, Trump became acquainted with the Aryan Brotherhood organization and learned it was involved in manufacturing drugs, selling drugs, and selling weapons. She said that she served Maynard in the Aryan

---

[1] At all relevant times, Maynard was in jail following his arrest for an unrelated shooting. The jail has a computerized system that records all calls made by inmates.

Brotherhood by making payments, writing letters, and other such tasks. Trump testified that, in July 2002, she and Cox both lived with Confer and his girlfriend. While staying with Confer, Trump learned of the existence of a violent plot by the Aryan Brotherhood against Forrest, a member. Maynard, the architect of the plan, wanted to kill Forrest because Forrest owed him money from a drug deal. At the time of the shooting, Maynard was involved in a power struggle within the gang leadership. Trump testified that a man named "Dutch," another high-ranking gang member, sent Saunders from Houston to take part in Forrest's shooting as well as another shooting that Dutch had planned against someone in Austin.

Trump testified that she, Confer, Cox, and Saunders, all high on methamphetamine, went to Forrest's house in the early morning hours of July 22, 2002, with weapons and ammunition. Trump testified that, when they arrived at Forrest's apartment building, Cox got out of the truck and walked to the front door of Forrest's apartment. After Confer and Saunders left the truck and Cox had left Forrest's doorstep, Trump realized a commotion was taking place, so she pulled the truck into the street in front of Forrest's apartment. Forrest followed her in his vehicle. After they drove a short distance, Trump testified that she observed Confer, Cox, and appellant fire their weapons at Forrest's vehicle. After the shooting stopped, Trump saw the three shooters run away.

Trump then testified that Forrest started up his car and drove toward her. Shocked, she drove away and Forrest followed. Although she looked for Confer, Cox, and Saunders, she did not see them. After a high speed chase, she encountered a police roadblock at the intersection of Williams and Lakeway, where both she and Forrest were detained.

5

*Other Testimony*

Calvin Story, a forensic firearms examiner, testified about the ballistics evidence in the case. In January 2003, Officer Jimmy Seals recovered a 9mm Taurus handgun in a trash dumpster located near the shooting scene. He also recovered a 9mm Glock handgun from nearby bushes. Story compared the Taurus and Glock handguns recovered by Seals to various bullets, jackets, and fragments recovered from the shooting location and from Forrest's vehicle. Story determined that two of the bullet fragments recovered were from the Taurus firearm. Story also determined that a third type of weapon, neither the Taurus nor the Glock, had been used in the shooting. Story testified that two of the bullet casings recovered from the crime scene had been fired by the Taurus firearm, five of the casings had been fired by the Glock, and that eight of the casings had been fired by the third, unrecovered weapon.

Joan Mailloux, evidence technician for the Georgetown Police Department, testified that she recovered a shipping carton and instruction manual for the 9mm Taurus model handgun from the toolbox of Confer's white pickup. The serial number on the gunbox matched the serial number on the Taurus firearm secured by Seals in January 2003. Inside the truck, Mailloux located the fingerprints of Trump, Confer, Cox, and Saunders. Mailloux also located Saunders's fingerprint on the instruction manual for the Taurus. Mailloux recovered two additional firearms from inside the toolbox of the trunk.

Christopher Benavidez, an agent with the federal Bureau of Alcohol, Tobacco, and Firearms, testified that the Taurus and Glock weapons recovered by Seals were both purchased from a Williamson County pawn shop in July 2002 by Karl Roth, Cox's associate. Benavidez

6

testified that it was a common practice of gang members to use associates without criminal records to purchase firearms to be used in the commission of gang-related crimes.

Joey Gordon, a Texas Ranger, testified concerning his evaluation of Forrest's vehicle and the entry angles of the bullets fired. Gordon testified that, based on his examination of the vehicle, multiple shooters had fired the weapons which caused the damage to the vehicle, and that the shooters were in close proximity to the vehicle when the shooting occurred.

Robbie Volk, a detective with the Gang Unit of the Austin Police Department, testified that in the summer of 2002, David Maynard (a/k/a "Baby Huey") was in a power struggle over statewide leadership of the Aryan Brotherhood of Texas gang. From his investigation into the Aryan Brotherhood, Volk determined that Maynard and other Aryan Brotherhood members were planning a murder in the Austin metropolitan area. Volk testified that the Aryan Brotherhood leadership in the Austin geographical region commonly used a member or affiliate of the gang from the Houston area to carry out or take part in gang-related assaults or murders in the Austin area. He testified that the Aryan Brotherhood was involved in various types of criminal activity, including manufacturing and selling methamphetamine, burglary, and murder. He testified that Confer was a "made member" of the Aryan Brotherhood holding the rank of major.

Charles Hayhurst, a gang intelligence officer with the Williamson County Sheriff's Office, testified concerning photographs of Saunders's tattoos that were admitted into evidence. These tattoos featured emblems such as a double lightning bolt, a swastika, an iron cross, a German eagle, and "187," a reference to the California Penal Code statute for murder. Hayhurst testified

7

that these tattoos were all emblems commonly associated with white supremacist groups or gangs. Hayhurst also testified that Saunders admitted being a member of the Aryan Brotherhood.

Count one of the indictment contained three paragraphs accusing Saunders of organized criminal activity. Paragraphs one and three alleged that Saunders, with the intent to establish, maintain, or participate in a combination or in the profits of a combination: (1) committed aggravated assault by intentionally, knowingly, or recklessly causing bodily injury to Forrest by shooting a firearm; and (2) committed aggravated assault by intentionally or knowingly threatening Forrest with imminent bodily injury while using or exhibiting a firearm. Paragraph two alleged that Saunders, as a member of a criminal street gang, committed aggravated assault by intentionally, knowingly, or recklessly causing bodily injury to Forrest by shooting a firearm. All three paragraphs were submitted to the jury in the court's charge, which authorized Saunders's conviction either as the primary actor in or as a party to the aggravated assault. *See* Tex. Penal Code Ann. § 7.02 (West 2003). The jury returned a general verdict of guilty.

**Discussion**

*Sufficiency of the Evidence*

In his first two issues, Saunders urges that the evidence is legally and factually insufficient to sustain the jury's verdict. The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (legal sufficiency); *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual sufficiency). In a legal sufficiency review, all the evidence is reviewed in the light

8

most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Griffin*, 614 S.W.2d at 159 (citing *Jackson*, 443 U.S. at 318-19). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

Saunders argues that the State established his presence near the scene of the confrontation with Forrest as well as his association with Trump, Confer, and Cox, but urges that there is no evidence that he fired a gun at Forrest. Saunders also asserts that there is no evidence that he solicited, encouraged, directed, aided, or attempted to aid another person to shoot at Forrest, nor that Saunders acted with the intent that Forrest be fired upon. "Mere presence is insufficient to sustain a guilty verdict" summarizes Saunders's argument that the evidence is legally insufficient.

The jury convicted Saunders of the first degree felony offense of engaging in organized criminal activity. The underlying felony offense alleged was aggravated assault. The jury was presented with two alternative theories of the conspiracy offense: either appellant committed

9

the offense as a member of a criminal combination or a member of a criminal street gang. The jury was also presented with alternative theories as to the manner of the commission of the underlying offense: either Saunders intentionally, knowingly, or recklessly caused bodily injury to Forrest and used or exhibited a deadly weapon, a firearm; or intentionally or knowingly threatened Forrest with imminent bodily injury and used or exhibited a deadly weapon, a firearm. The jury was charged on the law of parties. *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2003).

Saunders does not challenge the sufficiency of the evidence to show he was a member of a criminal combination or criminal street gang. Saunders's awareness of the intent behind the visit to Forrest's residence was shown through the conversations among Confer, Trump, and Maynard, in particular, the one about Saunders proving himself. Trump's testimony showed that the Aryan Brotherhood leadership in Houston sent Saunders to Austin to participate in killing Forrest and one other person. In terms of physical evidence, Saunders's fingerprints were found in Confer's truck and on the instruction manual for one of the firearms used in the shooting. His driver's license and ATM card were also found in Confer's truck. After the shooting, Saunders and Cox discussed their attempts to avoid being caught, wiping down the weapons used, and the police efforts to question Trump about the shooting. Further, Saunders's admittedly "b[]s[]" story to the police about getting drunk and not knowing where he was leads to a reasonable inference of a consciousness of guilt.

All of the above evidence, and the reasonable inferences therefrom, are a sufficient basis for a conclusion by the jury beyond a reasonable doubt, that Saunders was guilty as a party to commission of the offense of aggravated assault. Further, the jury could also have reasonably

10

concluded that the evidence was sufficient to hold Saunders guilty as a principal. Story, the ballistics expert, testified that at least three different guns were fired during the shooting. There were only four people at the scene of the shooting, and there was no evidence that Trump fired a weapon. Saunders's fingerprint was found on the instruction manual of the Taurus, one of the guns involved in the shooting. The evidence was legally sufficient to support Saunders's conviction. We overrule issue one.

In his second issue, Saunders contends that the evidence is factually insufficient to support the conviction. Saunders contends that the only evidence that could suggest that he committed the offense of aggravated assault is Trump's testimony that she drove him to Forrest's house with the intent to shoot Forrest. He urges that Trump's testimony has no probative value because she not only admitted to lying about the events of that night, but also was impeached by Forrest and had a motive for testifying untruthfully. He asserts that her testimony at most reflects a poorly conceived and botched effort to collect a debt.

The jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2006); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1986). Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). There is nothing irrational about a jury's decision to resolve conflicts in the evidence in favor of the State. *See Cain v. State*, 958 S.W.2d 404, 409 (Tex. Crim. App. 1997) ("A decision is not manifestly unjust

11

because the jury resolved the manifestly conflicting views of the evidence in favor of the State."). Evidence is not factually insufficient merely because the fact-finder resolved conflicting views of the evidence in the State's favor. *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd).

The jury heard Trump testify that she was in jail at the time of trial, that she had made a plea bargain to testify in return for a forty-year sentence as opposed to the life sentence she could have received, that she had used drugs heavily and served time for a state jail felony. The jury also heard about her fears for her safety and the safety of her children and family because of retaliation from the Aryan Brotherhood. The jury was free to sift and weigh Trump's testimony and make judgments about its value based on its evaluation of the credibility, motive to fabricate, and contradictions or inconsistencies in that evidence. Further, as discussed above, Trump's testimony was not the only evidence concerning Saunders's participation in the crime of aggravated assault, including physical evidence linking Saunders to the scene of the crime and weapon used. Even when the evidence is viewed in a neutral manner, it is sufficient to support a finding beyond a reasonable doubt that Saunders' was guilty of aggravated assault on Forrest. We overrule issue two.

### *Motion to Quash Indictment*

In his third issue, Saunders contends that the trial court should have granted his motion to quash the indictment because it failed to name or identify the persons who participated in the alleged combination, thus violating article 21.07 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 21.07 (West Supp. 2007). In issue four, Saunders urges that the failure to name the other participants in the alleged combination rendered the indictment

12

constitutionally inadequate. *See* U.S. Const. amends. VI, XIV; Tex. Const. art. I, § 10. We review the court's ruling de novo. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Yanes v. State*, 149 S.W.3d 708, 709 (Tex. App.—Austin 2004, pet. ref'd).

Saunders did not make these arguments to the trial court. *See* Tex. Code Crim. Proc. Ann. art. 1.14(b) (West 2005); Tex. R. App. P. 33.1(a). Saunders filed an amended motion to quash and exception to substance complaining that the indictment did not set forth the offense in plain and intelligible language because it did not allege the names of the co-defendants. *See* Tex. Code Crim. Proc. Ann. arts. 27.08 (West 2006). The only authority cited in the motion was article 27.08; there was no mention of the federal or state constitutions or of article 21.07. Further, neither the constitutions nor article 21.07 were brought to the court's attention when it ruled on the motion.

In order to prove that a defendant participated in a criminal combination, the State must prove that he participated with two or more other persons in a continuing course of criminal activities. *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). Saunders argues that in order to give a defendant adequate notice in order to prepare a defense, the State must allege the names of the other persons in the combination. The court of criminal appeals has held to the contrary, however. While the State may be required to prove the names of the other members of the combination as an evidentiary matter at trial, the omission of their names does not render the indictment defective. *State v. Duke*, 865 S.W.2d 466, 468 (Tex. Crim. App. 1993) (reversing order granting motion to quash). An indictment need not allege evidentiary matters for the purpose of notice when it clearly states the offense charged. *Wilson v. State*, 825 S.W.2d 155, 159 (Tex. App.—Dallas 1992, pet. ref'd) (discussing constitutional requisites of indictments). Saunders

13

cites no authority that persuades us that the indictment in this case denied him his constitutional right to notice of the offense of which he was accused.

Issues three and four are overruled.

### *Expert Testimony*

After Saunders's arrest and approximately five hours after the shooting, police swabbed his hands for the presence of gunshot residue. Police also swabbed the hands of Confer, Trump, and Forrest after the shooting. The swabs were submitted to the Department of Public Safety Crime Lab, where they were analyzed by forensic chemist, Juan Rojas. In his fifth issue, Saunders contends that the trial court erred in admitting Rojas's testimony regarding the results of gunshot residue tests. Saunders contends that the tests were administered too long after the shooting to be reliable.[2]

In determining whether to admit expert testimony of a scientific nature, a trial court must first determine that the proffered testimony is sufficiently reliable and relevant to assist the jury in reaching an accurate result. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000); Tex. R. Crim. Evid. 401. A trial court's decision on the admissibility of such testimony is reviewed for an abuse of discretion. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or

---

[2] We will assume error was preserved. After the court ruled that Rojas could testify only as to his conclusions, but not to the underlying test results on each of the four samples, the State wanted to withdraw him as a witness. The defense objected because the jury had before it testimony that swabs had been taken to perform a gunshot residue test. After much back and forth, the parties appeared to *agree* that Rojas would testify as to his conclusions.

14

principles. *Roise v. State*, 7 S.W.3d 225, 233 (Tex. App.—Austin 1999, pet. ref'd). An appellate court must uphold the trial court's ruling if it was within the zone of reasonable discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

To be reliable, evidence must satisfy three criteria: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Factors that could affect a trial court's determination about reliability, include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory or technique; (4) the potential error rate of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Id*.

There was no challenge to Rojas's credentials. Rojas testified during voir dire outside the jury's presence that under the guidelines of the Texas Department of Public Safety, swabs taken from suspects over four hours after the occurrence of the crime were generally not analyzed for the presence of gunshot residue due to the usual dissipation over time of the chemical elements associated with the discharge of weapons found on a person's hands. He testified that the four-hour guideline was based on the diminished likelihood of finding the elements associated with gunshot

residue in sufficient quantities for a positive result, not the potential occurrence of a false positive.[3]

He said it was possible, although not likely, that the test could result in a positive finding six or eight hours later. He referred to results obtained from samples over four hours old as "inconclusive" rather than unreliable. He agreed that the test itself did not become unreliable; the likelihood of evidence that had once been present disappearing was the concern.

Rojas further explained that the lab tested for antimony, barium, and lead, the three components of gunshot residue. In order to conclude that a result was positive, all three elements must be present above certain minimum threshold levels. (He testified that demanding that all three elements be present was a more conservative approach than the Federal Bureau of Investigation's approach, which only required finding two elements to call a result positive.) Rojas then detailed the measurements on the samples taken from all four individuals. The samples taken from Confer, Trump, and Forrest contained traces of all three elements, but in each case no more than one of the elements was found in an amount above the required minimum threshold. As a result, Rojas considered these tests "negative." Saunders's samples showed the presence of barium and lead above the required minimum thresholds, with only antimony being below the threshold level. Rojas considered this result to be "inconclusive."

The trial court ruled that Rojas would not be permitted to testify to the specific amounts of the three elements found in the samples taken from the four individuals. However,

---

[3] *See generally* 2 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 702.6, at 57-58 (3d ed. 2002) (discussing influence on admissibility of whether error rate in testing would result in false negative, weighing toward acquittal, or false positive, weighing toward conviction).

the court permitted Rojas to testify to his ultimate conclusions that the test results were negative or inconclusive.

Rojas repeated much of his voir dire testimony before the jury. He explained what gunshot residue was and how it might come to be deposited on someone's hands, including the possibility that it could be deposited on someone who had not handled a gun, but was in its vicinity. He described how gunshot residue dissipates over time, the lab's policy of not testing after four hours, and the necessity of finding minimum threshold amounts of all three elements in order to have a positive test. And in the testimony of which Saunders now complains, Rojas told the jurors that Confer's, Trump's, and Forest's hand swabs were negative for gunshot primer residue, and that Saunders's hand swabs were inconclusive for gunshot primer residue. During cross and redirect examination, Rojas testified that Saunders's results were negative if the only choices were "positive" or "negative," but they were inconclusive if given that additional choice.

We conclude that the trial court did not abuse its discretion by admitting the challenged testimony. The court had before it the expert's testimony that the gunshot residue test was reliable after four hours but that the state of the evidence may have degraded.[4] The court also knew the details of the testing performed on the four individuals, with the ultimate results consistent with the testimony concerning the test methodology. The court was entitled to accept that testimony and determine that the test was reliable and the expert's testimony admissible. *See Bethune v. State*, 821 S.W.2d 222, 225 (Tex. App.—Houston [14th Dist.] 1991), *aff'd*, 828 S.W.2d

---

[4] There is no contention that the underlying theory was invalid or that technique was invalid or incorrectly performed. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

14, 14 (Tex. Crim. App. 1992) (admitting DNA evidence; expert testimony that DNA test very reliable forensic test; no possibility of false positive because any degradation of sample will only lead to no result at all). The trial court serves as the "gatekeeper" and determines the reliability of the test; not the correctness of the expert's conclusions. *See Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997).[5]

Ultimately, appellant's objection to the testimony was to the contrast between "inconclusive" and "negative," a problem largely cured during his cross-examination of Rojas when Rojas testified that the test results could be viewed as negative for all four individuals. An appellate court will not reverse a judgment if the appellate court determines that the error did not affect the substantial rights of the defendant. Tex. R. App. P. 44.2(b). As previously discussed, a large volume of evidence was admitted during the case. Given the overwhelming evidence in the case, the testimony concerning the gunshot residue, which was not emphasized or crucial to Saunders's conviction, was harmless error.[6] We overrule appellant's fifth issue.

---

[5] In his motion for rehearing, Saunders asserts without further elaboration that "the *Hartman* case, read in conjunction with the cases cited in Appellant's brief actually dictate[s] a reversal in the case." The other opinions cited in Saunders's brief were: *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (discussing admissibility of "soft" science evidence); *Nenno v. State*, 970 S.W.2d 549, 560-61 (Tex. Crim. App. 1998) (same); *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999, pet. ref'd) (same). We have reviewed these opinions and remain convinced that our initial conclusion was correct.

[6] Saunders was charged as a party as well as a principal. To secure a conviction as a party, the State did not have to show that Saunders himself pulled a trigger. *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2003).

**Conclusion**

Saunders's motion for rehearing is overruled. We affirm the judgment of conviction.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed on Motion for Rehearing

Filed:   May 8, 2008

Do Not Publish

19