

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-18-00055-CR

Gina Janay **POTTS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 2, Guadalupe County, Texas
Trial Court No. CCL-15-0938
Honorable Frank Follis, Judge Presiding

Opinion by:     Rebeca C. Martinez, Justice

Sitting:     Rebeca C. Martinez, Justice
             Luz Elena D. Chapa, Justice
             Liza A. Rodriguez, Justice

Delivered and Filed: April 24, 2019

AFFIRMED

Gina Janay Potts challenges her conviction for driving while intoxicated. On appeal, she argues the trial court erred in: (1) denying her motion to suppress; (2) denying her request for a 705(b) hearing outside the presence of the jury regarding the facts and opinions underlying an expert's opinion; and (3) admitting her blood test into evidence. We affirm the judgment of the trial court.

**BACKGROUND**

Deputy Matthew Burdick observed a speeding vehicle traveling westbound on FM 78. FM 78 is a narrow two-lane road and, at the time of the incident, the roadway was lined with construction barrels. Deputy Burdick attempted to initiate a traffic stop by activating his overhead lights. When the vehicle failed to stop within forty-five seconds, Deputy Burdick activated his siren. Deputy Burdick contacted dispatch and reported that he was in pursuit of a vehicle that was not slowing down in response to his lights, leading him to believe the occupant was evading. In response, additional units were dispatched to assist.

Approximately thirty seconds after Deputy Burdick activated his siren, Potts turned into a gas station parking lot and came to a stop. Deputy Burdick drew his service weapon and ordered Potts to exit her vehicle. He instructed Potts to place her hands in the air and step in front of her vehicle. Once in front of her vehicle, Deputy Burdick instructed Potts to place her hands behind her back. He then holstered his weapon, restrained Potts with handcuffs, and instructed her to sit on the hood of the police vehicle. He did not pat her down. As back up arrived, Deputy Burdick asked Potts if he could look in her vehicle and purse for her identification. Potts consented and Deputy Burdick searched her purse, center console, and a pink bag. When Potts asked why she was placed in handcuffs, Deputy Burdick informed her that she was being detained because she was speeding and would not stop. In response, Potts volunteered she would never drink and drive or evade police.

Deputy Burdick noticed that Potts's breath smelled of alcohol and asked her if she had been drinking. Potts responded that she had one margarita. After Deputy Burdick conducted a field sobriety test, Potts was arrested for driving while intoxicated. She was then taken to the hospital where a blood warrant was obtained. The blood test revealed Potts's blood alcohol level was 0.159—almost double the legal limit.

Potts filed the following pretrial motions: Motion to Suppress Illegally Seized Evidence and Motion for Voir Dire of Expert Witness. The motions were not ruled on pre-trial, but both motions were denied during the trial. A jury found Potts guilty of driving while intoxicated as charged in the indictment. Potts appeals.

## MOTION TO SUPPRESS

In her first issue, Potts asserts the trial court erred in denying her motion to suppress because the initial detention was an illegal arrest that was not supported by probable cause. In arguing the detention was an arrest, Potts points to the circumstances surrounding the stop, including the amount of force displayed, the length of the detention, and the fact that she was not free to leave.

### *Standard of Review*

We review a trial court's ruling on a motion to suppress under an abuse of discretion standard. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). "Because the trial court is the sole trier of fact, we will give almost total deference to its determination of historical facts." *Story*, 445 S.W.3d at 732. "The trial court's application of the law to those facts, however, is reviewed de novo." *Id*.

### *Investigatory Detention or Arrest?*

Police-citizen interactions are divided into three categories: "(1) consensual encounters, which require no objective justification, (2) investigative detentions, which require reasonable suspicion, and (3) arrests, which require probable cause." *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011). "Whether a person is under arrest or subject to a temporary investigative detention is a matter of degree and depends upon the length of the detention, the amount of force employed, and whether the officer actually conducts an investigation." *Nash v. State*, No. 04-17-00468-CR, 2018 WL 2120995, at *2 (Tex. App.—San Antonio May 9, 2018, no

pet.) (mem. op., not designated for publication). Moreover, whether a detention is an investigative detention, rather than an actual arrest, depends on the reasonableness of the intrusion under all of the facts. *Id*. An officer may use force as reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997). Handcuffing may be reasonable in the course of an investigation and does not necessarily equate to an arrest. *Id*. at 118. During an investigatory detention, it may also be reasonable to surround a suspect's vehicle and approach with drawn weapons. *Id*. at 117.

If the officer uses force that exceeds what is reasonably necessary however, the force may transform the stop from an investigative detention to an arrest. *Mount v. State*, 217 S.W.3d 716, 724–25 (Tex. App.—Houston [14th Dist.] 2007, no pet.). What is deemed reasonably necessary must be considered from the perspective of a reasonable officer at the scene and allowances must be made in light of the fact that officers must "often make quick decisions under tense, uncertain, and rapidly changing circumstances." *Id*. at 725 (citing *Rhodes*, 945 S.W.2d at 118). Additional factors a court may consider in determining the reasonableness of a detention include the following: "the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, and the reaction of the suspect." *Id*. at 725. Another important factor to consider is whether the officer actually conducted an investigation after seizing the suspect. *Id*. at 725. Although an officer's opinion is also a factor to be considered, it is not determinative. *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991).

*Analysis*

In the instant case, Potts was detained not only for speeding but also for evading. Specifically, Potts was driving 98 miles-per-hour in a 65 mile-per-hour zone. This offense gave Deputy Burdick the right to initiate a traffic stop. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police

have probable cause to believe that a traffic violation has occurred"). Deputy Burdick's observation that Potts failed to respond to his lights and siren gave him further suspicion that Potts was evading detention with a vehicle, which is a third-degree felony. TEX. PENAL CODE ANN. § 38.04(b)(2)(A); *see Jenkins v. State*, 454 S.W.3d 712, 713 (Tex. App.—Corpus Christi 2015, no pet.) (concluding an appellant was evading when the officer activated his emergency lights and siren, and it became clear to the officer that the vehicle was not going to yield); *Baines v. State*, 418 S.W.3d 663 (Tex. App.—Texarkana 2010, pet. ref'd) (finding evidence legally sufficient for evasion, despite a very short duration of chase and speed).

Deputy Burdick testified he drew his weapon due to safety concerns. Specifically, he did not know how many people were in the vehicle or whether they were armed; the traffic stop was late at night; and he had reason to believe that Potts was initially evading. Moreover, Deputy Burdick immediately conducted an investigation upon detaining Potts, asking her for information such as her name and birthdate, calling in her information to dispatch, and looking up her license plate. A search of Potts's vehicle was only conducted after she consented to Deputy Burdick looking in her vehicle and bags for her identification. Deputy Burdick began investigating whether Potts had been drinking only after Potts volunteered she would never "drink and drive or evade arrest." Thus, the trial court did not abuse its discretion in impliedly determining that, under the circumstances reflected by this record, the traffic stop amounted only to a temporary investigative detention. We overrule Potts's first issue.

### RULE 705(B): VOIR DIRE EXAMINATION OF AN EXPERT

In her second issue, Potts claims she was harmed when the trial court denied her motion to voir dire Sheryl Peyton, a forensic toxicologist, out of the presence of the jury in accordance with Rule 705(b) of the Texas Rules of Evidence. When defense counsel requested to take Peyton on voir dire pursuant to Rule 705(b), the trial court allowed a hearing on Peyton's qualifications, but

ruled that any questions regarding the reliability of her testimony could be taken up on cross-examination during the trial. The trial court stated that it would decide whether the evidence was reliable "[a]t the point it occurred to [it]."

The State and defense counsel proceeded to question Peyton regarding her qualifications as a forensic toxicologist, outside the presence of the jury. However, when defense counsel began to question Peyton about the scientific reliability of the blood test, the trial court intervened stating: "We'll go into that later . . . . [I]f I find that she is qualified to testify, she can testify to whatever she's done . . . . [A]t this point, we're just talking about her qualifications to testify." After the trial court ruled Peyton was qualified to testify, defense counsel again objected to not being permitted to question Peyton about the facts and data on which her opinion was based. The trial court ruled "[t]he objection is denied to the extent that we're going to go any further at this point but I understand your objection." Defense counsel renewed the objection when the State offered the blood test into evidence.

### Standard of Review

We review a trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex. Crim. App. 2002). We will uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id*.

### Texas Rule of Evidence 705(b)

Under the Rules of Evidence, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." TEX. R. EVID. 702. The trial court serves as a gatekeeper by determining whether the proffered scientific evidence is sufficiently reliable and relevant to aid the jury. *Sexton*, 93 S.W.3d at 99.

The Rules of Evidence also provide that a criminal defendant must be permitted to "examine the expert about the underlying facts or data." TEX. R. EVID. 705(b). This examination must be conducted "[b]efore an expert states an opinion or discloses the underlying facts or data" and outside the jury's presence. *Id*. This "gatekeeping" hearing affords a defendant the chance to voir dire the expert witness and determine the foundation of the expert's opinion without fear of eliciting damaging hearsay or other inadmissible evidence in the jury's presence. *Alba v. State*, 905 S.W.2d 581, 588 (Tex. Crim. App. 1995). Because Rule 705(b) is mandatory, a denial of a timely and proper motion for such hearing constitutes error. *Id*.

The erroneous denial of a Rule 705(b) hearing is a non-constitutional error. *See Trevino v. State*, No. 04–12–00840–CR, 2014 WL 3518098, at *2 (Tex. App.—San Antonio 2014, no pet.) (mem. op., not designated for publication) ("Because the error is not constitutional, we will only reverse if it affected Trevino's substantial rights; otherwise, the error must be disregarded."). A non-constitutional error must be disregarded unless it affects a defendant's substantial rights. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict, while conversely, an error does not affect a substantial right if the appellate court has a fair assurance that the error did not influence the jury, or had but a slight effect. *Gonzalez v. State*, 541 S.W.3d 306, 313 (Tex. App.—Houston [14th Dist.] 2017, no pet.). In making this determination, we consider the entire record. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

*Analysis*

The record establishes defense counsel made a proper request for a Rule 705(b) hearing regarding the underlying facts and data used by Peyton in developing her expert opinion testimony. Therefore, we conclude the trial court erred in refusing to allow Potts to conduct a voir dire examination under Rule 705(b). *See Alba*, 905 S.W.2d at 588 ("The focus of Rule 705(b) is to

prevent the jury from hearing the underlying facts and data which might ultimately be ruled as inadmissible.").

Having determined that the trial court erred in denying Potts's voir dire request, we must decide if the error resulted in harm. *Id.*; *Trevino*, 2014 WL 3518098, at *2. Because the error is not constitutional, reversal is only proper if Potts's substantial rights were affected; otherwise, the error must be disregarded. *Alba*, 905 S.W.2d at 588; *Trevino*, 2014 WL 3518098, at *2.

In *Trevino*, appellant argued the denial of a Rule 705(b) hearing harmed his substantial rights because it resulted in the admission of testimony which failed to meet the *Kelly* test for reliability and admissibility of scientific evidence. *Id*. (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992) ("[F]or novel scientific evidence to be admissible, proponent must show reliability by showing it is (1) based on a valid underlying theory, (2) a valid technique was used to apply the theory, and (3) the technique was properly applied on the occasion in question.")). We held that the failure to hold a Rule 705(b) hearing did not affect Trevino's substantial rights because defense counsel already knew the basis of the expert's opinion testimony. *See Trevino*, 2014 WL 3518098, at *3 ("Trevino has not shown what facts or data underlying Dr. Kellogg's opinions his counsel could have learned from the voir dire examination that he did not already know. Further, Trevino does not claim that denial of the voir dire hearing hindered his defense counsel in his cross-examination."); *see also Brown v. State*, 974 S.W.2d 289, 292 (Tex. App.—San Antonio 1998, pet. ref'd) (noting if defense counsel already knew the basis of the expert's opinion testimony there was no need for a Rule 705(b) hearing).

Similarly, here, Potts has not shown what facts or data underlying Peyton's opinions she could have learned from the voir dire examination that she did not already know. The record indicates defense counsel had the chemist's notes and was aware of the underling facts and data. Moreover, the denial of the voir dire hearing did not hinder defense counsel's cross-examination;

instead, the record shows he thoroughly cross-examined Peyton about the facts and data underlying her opinions. Additionally, Potts's brief does not refer to any damaging, inadmissible testimony shared in the presence of the jury that could have been discovered in a Rule 705(b) hearing and otherwise excluded from evidence. Based on the record before us, we cannot say the denial of Potts's request for a Rule 705(b) hearing affected her substantial rights; therefore, the trial court's error in not allowing such a hearing was harmless. We overrule Potts's second issue.

### ADMISSION OF BLOOD TEST RESULTS

In her final issue, Potts argues the State failed to demonstrate the reliability of the blood testing process. Potts contends the testing process was unreliable because (1) DPS was applying the technique of gas chromatography incorrectly in using a single point calibration curve instead of a multipoint calibration curve; and (2) the results of the single point calibration curve were unreliable because the lab had not conducted linearity studies within the timeframe required by DPS.

Potts further asserts that the "relevant scientific community does not accept [] single point calibration as a proper technique for testing blood for alcohol because it is so prone to errors." Citing recent scientific studies, Potts challenges the application of a single point calibration curve by arguing the evidence was unreliable under *Kelly*.

On direct examination, Peyton was asked by the State to explain the "calibration controls." She testified that at the time Potts's blood was tested in 2015, the Texas Department of Public Safety was utilizing "single point calibration." Peyton then explained that DPS had recently switched from a single point calibration curve to a multipoint one. According to Peyton, while a multipoint curve allows the lab to measure alcohol concentration using "several numbers," a single point calibration curve was still reliable because controls were placed near the upper and lower quantitative limits. The State moved to admit Potts's blood test results into evidence; however,

defense counsel objected and asked to take the witness on voir dire. On voir dire, Peyton was asked about the reliability of a single point calibration curve, and Peyton responded that the test was scientifically acceptable with the controls put in place. The toxicology report of the blood sample was admitted into evidence.

### Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 785 (Tex. Crim. App. 2006)*; Sexton*, 93 S.W.3d at 99. We uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id*.

### Admission of Single Point Calibration Blood Test

Few jurisdictions have considered the reliability of single point calibration. Of those jurisdictions that have, it has been consistently held that single point calibration is a sufficient and acceptable test when there are proper controls. *See State v. Hebert*, 559 So. 2d 821, 833 (La. Ct. App. 1990) ("[S]ingle point calibration is sufficient, given the totality of the regulations, the controls mandated, and the technical nature of the gas chromatograph."); *Commonwealth v. Lara*, No. 517 MDA 2013, 2014 WL 10980093, at *4–5 (Pa. Super. Ct. Feb. 19, 2014) (holding the trial court did not abuse its discretion where it admitted blood evidence because the sample was tested in conformance with the procedures required by the Pennsylvania Department of Health, even though there were no separation matrix tests conducted at the time this batch of samples were tested, and this outweighed the testimony and opinion of an expert stating single point calibration was a deficient test). The reliability of single point calibration at the time Potts's blood sample was tested is not in question. At the time Potts's blood was tested, single point calibration was still the approved method by the State—the lab was accredited by the public safety director of the Texas Department of Public Safety and certified by the American Society of Crime Laboratory

Directors (ASCLD). Moreover, the fact that DPS had recently changed its operating procedures does not establish the test was inaccurate.

As for the linearity studies being out of date, non-compliance with a standard operating guideline has not been held to automatically render a blood result inadmissible. *See Bekendam v. State*, 441 S.W.3d 295, 362–63 (Tex. Crim. App. 2014) (holding a test performed by a trained expert, with a validated and calibrated instrument, was reliable even though the test did not strictly follow the Department of Public Safety's policy). Here, Peyton testified that linearity studies are not the primary means for identifying whether the test is linear. Peyton testified that the purpose of the linearity studies is to determiine if the instrument's flame ionization detector is working correctly, but she also clarified that the studies are only backups. She explained that the primary method of detecting whether the instrument is working correctly is through the calibration and control process conducted with each batch.

Peyton further testified that she followed proper protocol and that the headspace gas chromatograph instrument was working properly when she analyzed Potts's blood. She testified she knew the instrument was working properly because she ran a series of calibrations and controls and there was nothing abnormal with the result. Peyton also testified she ran each blood sample twice to ensure the results were consistent. She stated that had the variation between the two blood samples been greater than ten percent (the margin of error at the time of testing in 2015), she would have known something was wrong.

*Analysis*

Based on Peyton's testimony, the trial court could have reasonably concluded Potts's blood sample was analyzed in accordance with proper standards and controls. The trial court also could have reasonably concluded that evidence of the linearity studies being out-of-date did not render

the test unreliable because Peyton testified the linearity studies were only a backup, not the primary source in determining whether the instrument was working correctly.

Because Peyton testified she followed protocol in analyzing the blood and she ran a series of calibrations and controls to establish the instruments were working properly, we conclude the trial court did not abuse its discretion in determining the blood test results were reliable and admissible. *See Jannah v. State*, No. 01-14-00250-CR, 2015 WL 1544619, at \*5 (Tex. App.—Houston [1st Dist.] Apr. 2, 2015, no pet.) (mem. op., not designated for publication) (holding a blood sample was not rendered unreliable, even though the sample contained blood clots and was not properly homogenized, where a technician had followed proper protocol and ensured through calibration and controls that the headspace gas chromatograph instrument was working properly). We thus overrule Potts's final issue on appeal.

## CONCLUSION

Having overruled Potts's issues on appeal, we affirm the judgment of the trial court.

Rebeca C. Martinez, Justice

DO NOT PUBLISH