

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

No. AP-75,678

KER'SEAN OLAJUWA RAMEY, Appellant

v.

THE STATE OF TEXAS

Direct Appeal of Case 05-12-7342 of the
24th Judicial District Court,
Jackson County

*WOMACK, J., delivered the opinion for a unanimous Court.*

The appellant Ker'sean Olajuwa Ramey was convicted of capital murder on January 16,

2007. Pursuant to the jury's answers to the special issues set forth in Code of Criminal Procedure

Article 37.071, sections 2(b) and 2(e),[1] the trial judge sentenced the appellant to death. The

---

[1] *See* Act of June 16, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2899-900 (amended 2005) (current version at CODE CRIM. PROC. art. 37.071, § 2(g)). Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

appellant raises eight points of error in direct appeal to this court.[2] Finding no reversible error, we affirm.

## I.  Jury-selection Issues

The appellant's first and second points of error focus on alleged *Batson* violations during jury selection. In *Batson v. Kentucky,* the United States Supreme Court held that discrimination on the basis of race during jury selection violates the Fourteenth Amendment.[3] Motivated by a need to eliminate racial prejudice from peremptory strikes, the *Batson* court devised a three-part test to determine whether purposeful racial discrimination was employed in voir dire procedures.[4] The *Batson* holding (1) requires defendants to establish a prima facie case of discrimination, (2) requires prosecutors then to offer race-neutral explanations for their use of peremptory strikes, and (3) ultimately gives the trial court discretion in determining whether the neutral reasons offered are pretextual.[5] We now turn to the appellant's two *Batson* claims.

## A.  Applying *Batson* to Jury Shuffles

In his first point of error, the appellant argues that the State performed an impermissible jury shuffle on the second venire panel in violation of his Equal Protection rights. The appellant contends that the principles established in *Batson* naturally extend to the jury shuffle, since it is part of the Texas jury-selection process. The appellant relies on *Miller-El v. Dretke*, a Texas death-penalty case reversed based on racial discrimination in jury selection. He posits that the

---

[2] *See* CODE CRIM. PROC. art. 37.071, § 2(h).

[3] *Batson v. Kentucky,* 476 U.S. 79, 81 (1986).

[4] *Id.,* at 87.

[5] *Batson,* 476 U.S.,at 96-97; *Miller-El v. Dretke*, 545 U.S. 231, 267 (2005) (Breyer, J., concurring).

United States Supreme Court's decision in *Miller-El* impliedly overruled this Court's decision in *Ladd v. State*,[6] which previously addressed this issue. While *Ladd* did not endorse the argument that *Batson* applies to jury shuffles,[7] neither did it reject the argument.[8]

Pursuant to Article 35.11, when selecting a jury "either side may [require the court to] literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire panel are seated and reached for questioning."[9] The question of discrimination in connection with the jury shuffle was addressed in *Miller-El*, in which the appellant argued that race was a factor in the State's request for a shuffle. The Court looked to "'the totality of the relevant facts' about a prosecutor's conduct" in determining purposeful discrimination for the *Batson* claim.[10] Although the jury shuffle was indeed one of four considerations in determining purposeful discrimination in *Miller-El*, it merely "raise[d] a suspicion that the State sought to exclude African-Americans from the jury."[11] Thus, the jury shuffle was "the first clue" to a wide spectrum of racial discrimination practiced in the jury-selection practices of the State, and not the

---

[6] *Ladd v. State,* 3 S.W.3d 547, 563-64 (Tex. Cr. App. 1999).

[7] *Id*, at 563 n.3.

[8] *Id.*, at 564 ("Assuming *arguendo* that *Batson* extends to jury shuffles, we find no clear error ….").

[9] *Miller-El*, 545 U.S., at 255; CODE CRIM. PROC. art. 35.11.

[10] *Miller-El*, 545 U.S., at 239 (quoting *Batson*, 476 U.S., at 94).

[11] *Miller-El,* 545 U.S., at 254. The *Miller-El* holding was based on the "totality of the relevant facts" regarding racially motivated peremptory strikes. *Miller-El,* 545 U.S., at 239, citing *Batson,* 476 U.S., at 94. The relevant facts included (1) substantial similarities in a side-by-side comparison between white venire members and African-American venire members who were peremptorily stricken; (2) the request of the jury shuffle; (3) the "contrasting voir dire questions posed respectively to black and nonblack panel members" regarding descriptions of the death penalty; and (4) the Dallas County District Attorney's manual and his long-standing policy of "systematically excluding blacks from juries." *Miller-El*, 545 U.S., at 241, 253-255, 255, 263. While this evidence in the aggregate suggests purposeful racial discrimination, it does not answer the question of whether jury shuffling on its own would be subject to the *Batson* rule.

crux of the issue.[12]

Other appellants also have attempted to argue, without success, that *Batson* extends to jury shuffles.[13] In *Urbano v. State*, the appellant argued in the Court of Appeals that he was denied a *Batson* hearing following the State's request for a jury shuffle.[14] The Court was "not inclined to make the type of broad expansion of the law appellant [sought]."[15] And, as previously discussed in *Ladd*, this court reviewed an appellant's argument that *Batson* naturally extends to jury shuffles and ultimately did "not endorse such a view."[16] We decline to hold that *Miller-El* overrules *Ladd*. We will determine this issue by looking at the shuffle as one of the facts of the case.

When the first venire panel did not provide sufficient jurors for the trial, a second venire panel was brought into the court. The trial court asked the State and the appellant whether they would like to shuffle this second jury panel. The defense declined, and the State requested a shuffle. The appellant contends that the State's request for a jury shuffle was based on racially-motivated presumptions because the State had not yet viewed the juror questionnaires, which would have included their opinions on the death penalty.

The State argues that, because the appellant made no objection to the jury shuffle, he has no right to appeal this issue. The appellant brought to the trial court's attention the fact that the

---

[12] *Miller-El*, 545 U.S., at 253.

[13] *See Densey,* 191 S.W.3d, at 304; *Urbano v. State,* 808 S.W.2d 519, 520 (Tex. App.–Houston [14th Dist.] 1991, no pet.).

[14] 808 S.W.2d, at 520.

[15] *Id.*

[16] *Ladd,* 3 S.W.3d, at 563.

shuffle would cause many jurors who were ethnic minorities to be moved further down the list. The trial court engaged in a discussion of the racial motivations for the jury shuffle at the request of the defense. We shall assume, *arguendo*, that this was sufficient to preserve the issue for review.

Because "the burden shifts to the State to come forward with a race-neutral explanation for challenging black jurors," we turn to the explanation proffered by the State.[17] The prosecutor told the court:

> I have individuals here in Victoria who have assisted me in going through the list and given me information about the prospective jurors. … I have gotten that information from a number of different individuals. And in doing that I looked at this list and the overwhelming majority of the folks that they had suggested would be good State's jurors were towards the back of the panel. And so in light of that I requested a shuffle. … I will tell the Court as an officer of the Court that those individuals, probably 75-80 percent of the ones they had told me would be good State's jurors were towards the back. And so that's why I asked for a shuffle.

The defense offered nothing further, and the trial court recessed. It is unclear whether the trial court made a ruling; however, the trial court's subsequent actions implicitly denied the appellant relief.

The explanation proffered by the State, if believed, is sufficiently race-neutral. We defer to the trial court's ruling on this point.

### B. *Batson* Motion on Venire Member Cheryl Steadham-Scott

In point two of his brief, the appellant argues that the State used a peremptory challenge against venire member Cheryl Steadham-Scott in a racially discriminatory manner in violation of *Batson.* Again the appellant objected to the strike by requesting a racially-neutral explanation,

---

[17] *Batson*, 476 U.S., at 97.

much as he did in the first point of error.

The State had informed the trial court that it would not challenge this juror for cause. The appellant passed on questioning the witness. The State peremptorily challenged her. The appellant did not object to this strike at the time, nor did he even use the word "Batson." He merely requested that her questionnaire be included in the record. After the jury was selected, but before it was sworn in, the appellant requested a racially-neutral explanation for the striking of Steadham-Scott. During the discussion which followed, the State declared that it was unprepared for a *Batson* motion since one was never requested, but claimed that Steadham-Scott's answers to the prosecutor's questions as well as her juror questionnaire led to racially-neutral reasons for a peremptory strike, such as her ambivalence regarding inflicting the death penalty.

While indeed there was a brief allusion to race in the jury questionnaire and then on individual voir dire, the record supports the trial court's ruling that the State struck Steadham-Scott because of her inconclusive opinions on the death penalty and not her identity as an African-American. Steadham-Scott was repeatedly unable to answer the State's questions regarding her ability to adjudge the death penalty, both in her jury questionnaire and during voir dire. When asked whether she understood the death penalty or whether she would change it, she replied, "Yea. I don't know how I would change it, but–I don't know how I would change it." When asked if she believed in the death penalty, she responded, "I mean, you're asking me stuff like do I believe in the death penalty. I don't know if I believe in it, you know." On the jury questionnaire, she left blank the question, "Have you ever been opposed to the death penalty?" and responded in another section on the questionnaire that she was "not opposed or . . . in favor of it." Points of error one and two are overruled.

II. Guilt-Stage Issues

A. Summary of the Evidence

The bodies of Celso Lopez, Tiffany Peacock, and Sam Roberts were found in Roberts's residence by his parents on August 25, 2005. Lopez had been shot four times: once in the cheek and three times in the back of the head. Peacock was shot twice in the head. Roberts was shot five times: once in the chest, once in the neck, and three times in the back of the head. They had been killed on or about August 24.

Stacy Johnson, the appellant's former girlfriend, testified that he called her at 12:29 a.m. and 12:59 a.m. on August 25. He went to her house after their conversation, and slept there until shortly before 6 a.m. She said that he seemed "distant."

Two days later, Johnson accompanied the appellant to his house where he dug up "something" from his backyard. Johnson drove him to a dam. While Johnson was driving, the appellant called his former step-father, Lonny Lyte. (Both Johnson and Lyte testified about this conversation.) The appellant asked Lyte, "If you was to kill somebody, what would you do with the guns?" Lyte responded by saying that he would throw them in the river.

When they reached the dam, Johnson saw the appellant throw two pistols into the water. She later returned to the dam with the police and pointed out to the dive team the place where she remembered him throwing the pistols. They were found in the approximate location she indicated.

After he threw the pistols in the water, the appellant admitted to Johnson that he had committed a murder. He first said, "You know what this is about," to which she responded in the affirmative. When they returned to her house, he admitted to everything in detail, and he threat-

ened to kill her if she told anyone.

A firearms examiner from the Department of Public Safety testified that markings on the bullets that were recovered from the victims' bodies were consistent with the bullets having been fired from the pistols that were recovered from the water at the dam.

The pistols had been stolen from a residence on August 19, 2005. The owner of the pistols identified them, and one of the pistols was further identified by records of registration. Gerald Manzanalez and Christopher Times testified that, on August 19, they and the appellant had broken into a residence where they stole the pistols and some other firearms.

LeJames Norman testified that, on August 24, he and the appellant had gone to the scene of the murders, Sam Roberts's residence. Their objective was to steal 100 kilograms of cocaine they believed to be inside.

He said that he and the appellant prepared by stealing masks from a discount store. The jury saw the store's surveillance videotape which showed them stealing the masks at 9:22 p.m. on August 24.

Norman testified that they also prepared by wrapping tape around their shoes so as not to leave a trail. They donned their masks and cocked their guns before entering the house. They knocked on the door. Celso Lopez answered, and the two men forced their way inside. Norman held a gun on Lopez, while the appellant ran to the rear of the home, where he hoped to find the cocaine. As the appellant searched for the drugs, Norman accidentally shot Lopez in the cheek. The appellant quickly returned to the front room and forced Lopez, bleeding and begging for help, to move to a bedroom and lie on the floor.

At that point Roberts came home, accompanied by Peacock (his girlfriend). When she

saw what was happening, Peacock panicked and tried to run away. Norman grabbed her and forced her to her knees inside the house, near the front door. As she was bending down, he shot her in the back of the head. Seeing his girlfriend fall limp to the floor, Roberts attacked Norman. The two men "tussled" in the kitchen until the appellant shot Roberts, freeing Norman who immediately shot Roberts several more times while he lay on the floor. The appellant then returned to the bedroom and shot Lopez in the back of the head as he lay on the floor.

The appellant and Norman left the house. As they walked away, Norman realized that he had left his police scanner inside the house. The appellant quickly returned to retrieve the scanner. While inside, he shot the victims several more times to ensure that they were dead.

The appellant and Norman did not find any cocaine.

Eight other witnesses testified that the appellant had admitted to them that he had participated in the murders.

## B.  Extraneous-Offense Issues

In his sixth point of error, the appellant argues that the trial court erred in admitting evidence relating to an extraneous offense in which the appellant, along with three other men, stole several firearms from the residence of Kenneth Nairn five days before the shootings in the instant case. Two of the pistols stolen from the Nairn residence were later used in the triple homicide, and the appellant was connected to both offenses. The appellant repeatedly objected at trial to the admission of this evidence as irrelevant. On appeal, the appellant now wishes to contest the evidence as irrelevant *and* as being improper character evidence, pursuant to Rule of Evidence 404(b), which deems evidence about a person's prior bad acts inadmissible if it shows

action in conformity therewith.[18] The State contends that the appellant did not preserve error for a Rule 404(b) objection since the appellant never objected to the evidence on this basis. This court has previously held that relevancy objections will not preserve error for Rule 404 claims on appeal.[19] Because the record does not show any objection at trial to improper character evidence with respect to the Nairn burglary, we shall not review it on appeal, and thus look only to relevance.

Evidence is relevant if it makes a fact of consequence "more probable or less probable than it would be without the evidence."[20] All relevant evidence is therefore admissible, unless inadmissible under other rules or statutory authority.[21] This court has previously held that extraneous offenses are admissible when they are relevant to a material issue in the case.[22]

The evidence that the appellant sought to exclude—the testimony of Kenneth Nairn, Agent David Taylor, Texas Ranger Morgan Miller, Gerald Manzanales, and Christopher Times, in addition to State's Exhibits 1 through 38—is relevant to a material fact of the offense: the means of its commission. The pistols used in the triple homicide were two of the pistols stolen in the Nairn burglary by the appellant. This evidence connects the appellant to the homicides.

---

[18] R. EVID. 404(b).

[19] *See Camacho v. State*, 864 S.W.2d 524, 533 (Tex. Cr. App. 1993); *Medina v. State*, 7 S.W.3d 633, 643 (Tex. Cr. App. 1999) ("Appellant made only a relevancy objection at trial. Such an objection does not preserve error concerning a Rule 404 extraneous offense claim.").

[20] R. EVID. 401.

[21] R. EVID. 402.

[22] *Crank v. State*, 761 S.W.2d 328, 342 (Tex. Cr. App. 1988); *Williams v. State,* 662 S.W.2d 344, 346 (Tex. Cr. App. 1983); *Elkins v. State,* 647 S.W.2d 663, 665 (Tex. Cr. App. 1983); *Rubio v. State,* 607 S.W.2d 498, 506 (Tex. Cr. App. 1980) ("Extraneous transactions constituting offenses shown to have been committed by the accused may become admissible upon a showing by the prosecution both that the transaction is relevant to a material issue in the case … and … the relevancy value of the evidence outweighs its inflammatory or prejudicial potential.").

## 1. The Testimony

Kenneth Nairn was the owner of the home that was burglarized and the firearms that were stolen. He testified that the specific pistols stolen were family heirlooms which he knew were missing immediately after the burglary and which he was able to identify following their discovery in the water at the local dam. His testimony was relevant because it helps to identify the two guns stolen by the appellant as the same guns used in the triple homicide by the appellant through special markings and serial numbers.

David Taylor was a special agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who testified as to the discovery and identity of one of the weapons used in the offense, the H&R .22 short-barreled pistol found at the dam. His testimony is relevant because it tends to connect the appellant to the murder weapon, which is a material component of the case, and thus makes the appellant's use of the gun in the triple homicide more probable than not. He was able to track ownership of the H&R pistol by researching the serial numbers that remained on it. The registration identified Nairn as the purchaser of the gun in 1984 from a pawn shop.

Texas Ranger Morgan Miller testified that he was present with Johnson and the dive team when they recovered the two pistols thrown in the water by the appellant. He testified that they were in the approximate location directed by Johnson, who was with the appellant when he threw the pistols in the water.

Gerald Manzanales and Christopher Times testified that they were the appellant's accomplices for the Nairn burglary, in which they and others stole several firearms from the Nairn residence. Their testimony linked the appellant to the theft of a pistol that was used in the triple homicide.

## 2. State's Exhibits 1-38

State's exhibits 1-38 include physical and demonstrative evidence pertaining to the Nairn burglary, primarily in the form of photographs. Two of the exhibits were the actual pistols retrieved from the water by the dive team. Nairn identified them as two of the guns missing from his collection. The photographs admitted include photographs of the Nairn residence, particularly of the extensive firearms collection. The evidence also included the firearms registration associated with the pistol found in the water and used in the shootings, as registered to Nairn in 1984. The photographs in evidence were also showed the exterior of the residence where the appellant and Johnson resided at the time of the offense, as well as photographs of its torn-up floorboards, under which a large black duffel bag stuffed with rifles was found. These exhibits aided the witnesses with their testimony and are relevant because they illustrate the appellant's access to the murder weapon.

## 3. Conclusion

The evidence that the appellant contests is the testimony and photographs relating to the Nairn burglary. These exhibits and testimony helped the finder of fact to determine whether the appellant had access to the pistol, which is evidence tending to prove that he was a participant in the murders. We overrule the appellant's sixth point of error.

## C. Expert Witnesses

## 1. Dr. John Stash

In his fourth point of error, the appellant argues that the autopsy report on Roberts should not have been admitted because the physician who performed the autopsy, Dr. John Stash, was not a qualified medical examiner at the time the autopsy was performed. The appellant further

contends that Dr. Stash committed perjury by testifying about the autopsy results when he stated that he "worked as a medical examiner for the Bexar County Medical Examiner's Office," and that this testimony intentionally misled the jury, helping to convict the appellant.

The State contends that the appellant did not preserve this error because he did not object to Dr. Stash's qualifications at voir dire or during his testimony. In order to preserve an issue for appeal, an objection must be made at trial.[23] The appellant made no objection during trial regarding Dr. Stash's qualifications as a medical examiner.

In order to overcome this deficit, the appellant filed a motion in arrest of judgment, which is "a defendant's oral or written suggestion that, for reasons stated in the motion, the judgment rendered against the defendant was contrary to law."[24] But a motion in arrest of judgment is directed to substantive defects in the indictment[25] or the verdict,[26] or to an invalidity in the judgment.[27] It may not be based on the proof offered at trial.[28] The proper motion for such a claim would be a motion for new trial.

If we assume that the motion in arrest of judgment could have been treated as a motion for new trial,[29] it has no merit. The appellant would seem to argue that the qualifications for

---

[23] R. APP. PROC. 33.1.

[24] R. APP. PROC. 22.1.

[25] R. APP. PROC. 22.2(a).

[26] R. APP. PROC. 22.2(b).

[27] R. APP. PROC. 22.2(c).

[28] *State v. Savage*, 905 S.W.2d 268, 269 (Tex. App.–San Antonio, 1994), *aff'd*, 933 S.W.2d 497 (Tex. Cr. App. 1996).

[29] *See State v. Savage*, 933 S.W.2d 497, 499 (Tex. Cr. App. 1996) ("We have held that when an order is the functional equivalent of granting a motion for new trial, the reviewing court can look past the label assigned to the order by the trial court and treat the order as a motion for new trial.").

being the Medical Examiner must also be met by other medical examiners in the office. We do not read the applicable statutes that way.

The appellant reads the Occupations Code, section 155.105, as conflicting with Article 49.25, sections 2, 3, and 9, as well as with Article 38.35(f), thus precluding any physician in training from performing autopsies. Article 49.25 states that "no person shall be appointed medical examiner unless he is a physician licensed by the State Board of Medical Examiners," and also provides that "the medical examiner may, subject to the approval of the commissioners court, employ such deputy examiners, scientific experts, trained technicians, officers and employees as may be necessary to the proper performance of the duties imposed by this Article upon the medical examiner."[30] The Occupations Code, section 155.105 grants physicians-in-training permits to physicians "not otherwise licensed by the Board who [are] participating in a graduate medical education training program approved by the Board." It permits physicians-in-training to work as physicians, provided they do so under the supervision of a physician, and as part of a graduate medical education program.[31]

Dr. Stash was operating under a physician-in-training permit within the confines of Article 49.25. He was a graduate of an osteopathic medical school, an anatomic-pathology residency, and a forensic-pathology fellowship. He had been working as a medical examiner with the Bexar County Medical Examiner's Office when he performed the autopsy on Roberts on August 26, 2005. Dr. Stash was issued a physician-in-training permit beginning July 1, 2005, before the date of the autopsy in question, and was thus operating within the statute. Further, the

---

[30] CODE CRIM. PROC. art. 49.25, §§ 2, 3.

[31] OCC. CODE § 155.105.

autopsy report was signed by Dr. Stash, along with the Chief Medical Examiner, Vincent J.M. Di Maio, M.D., and other medical examiners in the Bexar County Medical Examiner's office.[32] Article 49.25's provision that "no person shall be appointed medical examiner unless he is a physician licensed by the State Board of Medical Examiners" means that no person shall be appointed *the* Medical Examiner; it does not apply to other medical examiners working in the office of the medical examiner. The appellant's fourth point of error is overruled.

## 2. Ronald Crumley

The appellant argues in his fifth point that the court erred in admitting the testimony of Ronald Crumley, the State's ballistics expert, because he was not a qualified expert witness and he could not conclusively determine whether the bullets and guns he examined were in fact the bullets and guns used in the shootings.

At trial, the appellant objected vaguely to Crumley's testimony based on materiality and relevance. He argues on appeal that he was objecting to the testimony based on the doctrine of law following *Daubert*, *Kelly*, and *Robinson*.[33] The appellant expressly did not object to Crumley's methodology at trial.

The Rules of Evidence permit expert witnesses to testify as to scientific or technical knowledge that will aid the trier of fact in determining relevant facts in a case.[34] The United

---

[32] Other medical examiners in the office who signed the autopsy report include Randall E. Frost, M.D., Deputy Chief Medical Examiner, Jennifer J. Rulon, M.D., medical examiner, D. Kimberly Molina, M.D., medical examiner, and Matrina J. Schmidt, M.D., assistant medical examiner.

[33] *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (U.S. 1993)*; Kelly v. State*, 824 S.W.2d 568 (Tex. Cr. App. 1992)*; E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

[34] Rule of Evidence 702 reads, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

States Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* that expert testimony must be both reliable and relevant.[35] Earlier, in *Kelly*, this court enumerated factors affecting the trial court's determination of reliability of scientific theories for expert testimony.[36] *Daubert* has to do with experts' qualifications to testify based on their methodology and expertise, not their conclusions, which the finder of fact must weigh. "[T]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."[37]

According to the record, the appellant did not object to Crumley's testifying as an expert at trial, nor to his methodology and practice as an expert. Rather, his objection was based on the expert's conclusions that resulted from his methodology and examination. The following exchange occurred during a discussion for a *Daubert* motion:

> [DEFENSE COUNSEL]: We're not questioning his methodology as to what he did. We're saying that his report states that he is unable to determine if any of the submitted bullets were fired from either of the submitted revolvers. With that being the case, he can't comment on the revolvers. He can't say whether they were fired from them. He can't say whether they weren't fired from them. He doesn't know and he says he hasn't changed his report and that is still his opinion today; is that correct?
>
> [THE EXPERT WITNESS]: That's correct.

---

Rule of Evidence 703 reads, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[35] *Daubert,* 509 U.S., at 579.

[36] *Kelly*, 824 S.W.2d, at 573. Such factors include "(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question."

[37] *Daubert*, 509 U.S., at 595.

[DEFENSE COUNSEL]: He can't testify to those guns, your honor.

[TRIAL COURT]: All right. Well, to the extent you're asking me to exclude him as an expert because of that, that's denied.

The appellant focuses his argument on the conclusions generated by the expert. He claims that because Crumley could not conclusively prove that the bullets he examined came from the guns he examined, then his methodology is untested and challengeable. This argument does not address methodology, the cornerstone of *Daubert*, and is therefore misplaced.

Crumley indeed satisfied the *Kelly* factors for "general acceptance" of a scientific theory or technical field, and he has even been recognized as a qualified firearms-identification expert by this court.[38] At the time of the appellant's trial, Crumley had been working as a firearm and tool-mark examiner with the Texas Department of Public Safety Crime Lab in Austin for almost fifteen years, had examined thousands of firearms and bullets, and had been qualified as an expert and testified for both the prosecution and defense in over one hundred trials. He held a Bachelor's degree, trained for a year and a half for this speciality in a crime lab in Austin, and also received training from the Southwest Institution of Forensic Science in Dallas, the Federal Bureau of Investigations ("FBI"), and the Bureau of Alcohol Tobacco and Firearms ("ATF"). At the time of the trial, Crumley was continuing his attendance at training seminars from various organizations, such as the Association of Firearm and Tool Mark Examiners and the Department of Public Safety ("DPS") Academy, and had been made supervisor of other firearm and tool-mark examiners. He also had published three brief articles in the *Association of Firearm and*

---

[38] *See Sexton v. State,* 93 S.W.3d 96, 101 (Tex. Cr. App. 2002).

*Tool Mark Examiners' Journal*.[39]

Additionally, Crumley testified to the tool-mark theory for identification of fired bullets. We have recognized that the underlying theory of tool-mark identification could be reliable for identifying fired bullets from individual firearms.[40] Crumley relied on this theory in identifying which bullets had been fired from the pistols and was able to make conclusions based on the evidence. In his testimony, Crumley testified to his examination of the two pistols allegedly used in the triple homicide: a long-barrel .22 caliber R.G. model and a short-barrel Herrington and Richardson model, along with the bullets retrieved from the victims' bodies. He examined the lands and grooves of the barrels of the guns compared to the lands and grooves of the bullets so that he could determine how they were fired and from which of the two firearms in question.

While Crumley was unable to determine whether any of the submitted bullets were fired from either of the firearms to the exclusion of all others, he was able to determine what bullets were *not* fired from certain guns. In comparing the types of bullets, guns, and gunshot wounds, Crumley was able to exclude specific bullet entries based on their lands and grooves. Placing his testimony with the rest of the evidence, a rational jury could determine the gun the appellant used during the shootings.

The trial court did not abuse its discretion in ruling that Crumley was qualified to testify as to these elements of lands and grooves on the bullets. The weight of his testimony was for the finder of fact. Because the appellant tries to object to the expert's conclusions by claiming his methodology is not generally accepted, his argument fails. Point of error five is overruled.

---

[39] *Sexton v. State,* 93 S.W.3d 96, 101 (Tex. Cr. App. 2002).

[40] *Ibid.*

## D. Court's Charge on Guilt

The appellant alleges in his third point of error that the trial court's instructions on accomplice testimony and lesser-included offenses were erroneous.

## 1. Accomplice Testimony

The appellant argues that the jury charge during the guilt phase of the trial did not sufficiently instruct the jury regarding the use of accomplice testimony. Specifically, he contends that the instruction stating that accomplices cannot corroborate each other's testimony was omitted, and that he was harmed by the omission of the requested instruction regarding the witness, Bradford Butler, since the witness could have been found to be an accomplice. He posits that, although Butler was not physically present during the shootings, he was indeed an active participant in the offense from the moment he stole the firearms with the appellant to the moment he discussed the burglary of the victim's home with the two shooters prior to the offense. Since the jury could have found him to be an accomplice as a matter of fact, Article 38.14 would have applied to his testimony.[41]

The appellant relies on *Gamez v. State*, which holds that accomplice witnesses cannot corroborate each other's testimony.[42]

The jury charge stated that Norman was an accomplice as a matter of law, because he could be charged and was charged with the same offense. It also said that Butler could have been an accomplice as a matter of fact, because the jury could find him to be an accomplice based on

---

[41] A witness is an accomplice as a matter of law if he could be indicted for the same offense. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Cr. App. 2006). Norman, the appellant's co-defendant, was an accomplice as a matter of law.

[42] *Id.,* at 323; *Caraway v. State*, 550 S.W.2d 699, 702 (Tex. Cr. App. 1977).

the evidence. Because there was a possibility that the jury could have found Butler to be an accomplice as a matter of fact, the appellant posits that the jury should have been instructed that Butler and Norman could not corroborate each other.

Code of Criminal Procedure Article 38.14 provides: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." An individual is not rendered an accomplice by mere presence at the scene of the crime, or by mere knowledge about the crime without disclosure of that knowledge.[43] It is well established that an accomplice is an individual who participates with a defendant before, during, or after the commission of a crime, and acts with the requisite culpable mental state to commit that crime.[44] Such participation or contribution in the culpable act must foster the commission of the offense.[45] The contribution need not be in the form of a physical act in the actual offense.[46] Thus, Article 38.14 prohibits convictions based on accomplice testimony alone.[47] There must be corroborating evidence that tends to connect the defendant to the

---

[43] *Cocke*, 201 S.W.3d, at 748; *Blake*, 971 S.W.2d, at 454.

[44] *Cocke*, 201 S.W.3d, at 748; *Paredes v. State,* 129 S.W.3d 530, 536 (Tex. Cr. App. 2004).

[45] *Cocke*, 201 S.W.3d, at 748; *Paredes,* 129 S.W. 3d, at 536.

[46] *Cocke,* 201 S.W.3d, at 748. *See also Paredes*, 129 S.W.3d, at 536. ("Participation requires an affirmative act or omission that promotes the commission of the offense with which the defendant is charged.").

[47] "The purpose of the instruction, therefore, is not to cast suspicion on the testimony provided by the accomplice or to encourage jurors to give it less weight than other testimony. Rather, the instruction merely reminds the jury that it cannot use the accomplice's testimony to convict the defendant unless there also exists some non-accomplice testimony tying the defendant to the offense." *Cocke*, 201 S.W.3d, at 747; *See also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Cr. App. 2002).

offense.[48]

If the record shows error in overruling a defendant's objection to the jury charge, we look to the record to determine whether the error "was calculated to injure the rights of the defendant."[49] The error made in trial must cause "some harm" to the defendant in order to be reversible.[50] The "actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."[51] Looking at the full record "may illuminate the actual, not just theoretical, harm to the accused."[52]

The non-accomplice witnesses to whom the defendant admitted his involvement include Stacy Johnson, Lonny Lyte, Cortney Hardaway, Otis Santellana, Marvin Ceasar, Jonathan Snyder, Kevin Childs, and Myron Hardaway. Additionally, there were several more witnesses who corroborated the testimony of both Norman and Butler without admissions; however, we will focus on the witnesses who testified to the appellant's admissions, and it is the testimony from these witnesses that corroborates both Norman and Butler's testimony–not each other.

a. Stacy Johnson and Lonny Lyte

The testimony of Johnson and Lyte was corroborative because it contained admissions of

---

[48] *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Cr. App. 1999) ("If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of Article 38.14 has been fulfilled.").

[49] CODE CRIM. PROC. art. 36.19.

[50] *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Cr. App. 1985).

[51] *Almanza*, 686 S.W.2d, at 171.

[52] *Id.*

guilt by the appellant and showed that the appellant possessed the murder weapons.

### b. Cortney Hardaway

Cortney Hardaway, one of the appellant's girlfriends at the time of the offense, who was also the mother of his two children, gave a statement and testified that the appellant admitted to her that he was in the house during the triple homicide. He also told her that people were shot. He also asked her to serve as his alibi for his whereabouts for the night of August 24 and threatened to kill her if she told anyone about the shootings. The appellant visited Hardaway at her parents' home on the 25th of August, the night following the shootings. When he confessed to her, he never expressly said, "I shot" someone, but rather that he was involved in the offense and that people "were shot."

### c. Inmates

Otis Santellana, Marvin Ceasar, Jonathan Snyder, Kevin Childs, and Myron Hardaway were inmates with the appellant during various stages of his incarceration following his arrest for this triple homicide. They either shared a cell with the appellant or spoke with him through the vents in prison, during which the appellant confessed to each of them of his involvement in the shootings. He discussed the details of his preparation for the shootings with various inmates – from the taping of the shoes to the use of face masks to the burning of the clothing. He detailed the order of events from the surprise presence of Lopez to the return to the house to retrieve the police scanner. He also emphasized his confidence in escaping a conviction because he believed the police did not have enough evidence on him. While the appellant admitted different portions of the events to different inmates, the course of events remained the same in each admission. These admissions collectively corroborated the testimony of the accomplice witnesses.

In light of the non-accomplice testimony heretofore discussed, we find that the omission in jury instructions with respect to Butler's testimony was harmless. Point of error three is overruled.

## 2. Lesser-included Offenses

The appellant also argues in the same point of error that the trial court erred because it did not instruct the jury regarding lesser-included offenses. Article 37.09 reads:

> An offense is a lesser included offense if:
> (1) it is established by proof of the same or less than all of the facts required to establish the commission of the offense charged;
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

A two-prong test is used to determine whether a lesser-included offense should be included in the jury charge.[53] First, "the lesser included offense must be included within the proof necessary to establish the offense charged, and, second, some evidence must exist in the record that if the defendant is guilty, he is guilty only of the lesser offense."[54]

The appellant's only argument on lesser-included offenses consists of one sentence: "The defendant further contends that the testimony of LeJames Norman, Bradford Butler and Cortney Hardaway proffers enough evidence that the Defendant did not shoot anybody to require lesser included offenses to be submitted to the jury." The appellant does not state which lesser-included

---

[53] *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Cr. App. 1993).

[54] *Id.* ("In applying the two-prong test, the trial court should make a determination as to whether the evidence of the lesser offense would be sufficient for a jury rationally to find that the defendant is guilty only of that offense, and not the greater offense.").

offenses he requested in the jury charge or whether they were denied. The appellant cites no testimony from the record to support his claim that he was entitled to lesser-included-offense instructions. And the appellant does not cite any case law specifically supporting his argument. He merely cites case law that generally discusses the doctrine of lesser-included offenses. The point of error is inadequately briefed, and it is overruled..

## E. Sufficiency of Evidence of Guilt

In his eighth and final point of error, the appellant raises both legal and factual insufficiency claims. He argues that the non-accomplice testimony was not sufficiently corroborated to convict the appellant. He further contends that the testimony of Stacy Johnson, Otis Santellano, and Cortney Hardaway does not corroborate the forensic evidence pertaining to the guns and the bullets, thus contradicting the witnesses' testimony detailing how the victims were killed. He argues that because these witnesses did not have personal knowledge of the shootings, their testimony was pure speculation.

### 1. Legal Sufficiency

Legal-sufficiency claims are based upon the Due Process Clause of the Fourteenth Amendment to the United States Constitution. On appeal, we view the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have convicted the appellant based on proof of the essential elements of the crime beyond a reasonable doubt.[55]

The appellant's argument assumes that Article 38.14 eliminates accomplice testimony from consideration. The appellant relies on *Brown v. State*, which states that "the test to determine the sufficiency of the corroboration is to eliminate from consideration the evidence of

---

[55] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

the accomplice witness and then examine the testimony of other witnesses to ascertain if there is inculpatory evidence which *tends to link* the accused with the commission of the offense."[56] But that is not the test for sufficiency of evidence to convict.

## 2. Factual Sufficiency

Claims of factual sufficiency are viewed–not in the light most favorable to the verdict–but rather in a neutral light.[57] The standard is (1) whether the evidence is so weak as to make the conviction clearly wrong and manifestly unjust, or (2) the trial court's finding is so against the great weight and preponderance of the contrary evidence as to be clearly wrong and manifestly unjust.[58]

The appellant's argument appears to be premised upon the claim that a jury must find proof beyond *all* doubt, and not proof beyond a reasonable doubt, in order to convict. The standard is that "the state must prove each issue submitted … beyond a reasonable doubt …."[59] The appellant centers this argument on (a) the claim that the guns could not be conclusively proven to be the guns that shot the victims, (b) the argument that accomplice testimony must be eliminated, and (c) the argument that the appellant's admissions were not factually sufficient since the people to whom the appellant confessed did not actually see the offense.

As previously discussed in point of error six, the appellant's argument regarding the

---

[56] *Brown v. State,* 672 S.W.2d 487, 488 (Tex. Cr. App. 1984) (emphasis in original).

[57] *Clewis v. State*, 922 S.W.2d 126 (Tex. Cr. App. 1996); *Escamilla v. State,* 143 S.W.3d 814, 817 (Tex. Cr. App. 2004).

[58] *See Clewis,* 992 S.W.2d, at 131-34; *Escamilla,* 143 S.W.3d, at 817; *Johnson v. State*, 23 S.W.3d 1 (Tex. Cr. App. 2000).

[59] CODE CRIM. PROC. art. 37.071, § 2(c).

weapons is unpersuasive. He argues that, because the guns were never conclusively proven to be the guns that shot the victims, the evidence is factually insufficient to convict. While the guns were never conclusively proven to the exclusion of all other guns to be the two used in the offense, a rational trier of fact could look at the evidence presented and determine that they were in fact the guns used. The testimony of ATF Agent Taylor, the serial numbers on the pistol found at the dam, Nairn's 1984 purchase and registration of the weapon, and the testimony of Johnson, who watched the appellant dig up the pistol and throw it in the lake two days after the murders, cumulatively provide sufficient factual evidence for a jury to find beyond a reasonable doubt that they were the guns used in the shootings. We hold that the jury's verdict was not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

As previously discussed in point of error three, the appellant's argument regarding accomplice testimony is also unpersuasive. The appellant reads Article 38.14 as requiring the court to eliminate all accomplice evidence in determining whether other evidence sufficiently connects the appellant to the offense. And as previously stated, we do not read the statute so. Article 38.14 requires corroboration – not elimination – in order to consider accomplice testimony.

The appellant further argues that the testimony from the individuals to whom he made admissions does not amount to direct evidence that he shot anyone. While this statement is indeed true of all admissions, it does not preclude a rational jury from determining that the appellant did commit the offense. We believe that there is sufficient evidence as a matter of fact to support a just conviction on the elements of the offense. Therefore, the appellant's eighth point of error is denied.

## V. Punishment-stage Issues

In a capital-murder trial, where the State seeks the death penalty, two questions must be submitted to the jury during the sentencing phase.[60] The jury must determine beyond a reasonable doubt "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," and whether the defendant "actually caused the death of the deceased."[61] The court must also charge the jury to consider all evidence of mitigating circumstances when considering the special issues.[62] In proving future dangerousness, the State may rely on several factors, including but not limited to: "(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence."[63] We note that these factors do not constitute an exhaustive list.[64]

In one point of error, the appellant complains of the testimony of two witnesses.

---

[60] CODE CRIM. PROC. art. 37.071, § 2(b)(1) & (2).

[61] *Id.*

[62] CODE CRIM. PROC. art. 37.071, § 2(d).

[63] *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Cr. App. 1987); *see also Martinez v. State*, 924 S.W.2d 693, 696 (Tex. Cr. App. 1996); *Barnes v. State*, 876 S.W.2d 316, 322 (Tex. Cr. App. 1994).

[64] *Barnes*, 876 S.W.2d, at 322.

## A. Royce Smithey

The appellant submits that the trial court erred when it overruled his objection to the testimony of Royce Smithey because Smithey was not an expert on future dangerousness. He was not offered as an expert witness regarding the future dangerousness of the appellant pursuant to the Rules of Evidence and *Daubert*; rather, Smithey was offered as a fact witness testifying to the nature of the prison system and not to the individualized nature of the appellant. He described individual prison "unit[s] like a city," in which different people hold different responsibilities. He also graphically described incidents of prison violence and escapes, as well as testifying about how the prison system operates, and how inmates are admitted, classified, housed, and transported.

This court has previously addressed such a claim about such testimony from this witness and has held that testimony regarding general prison conditions is both relevant and permissible.[65] The appellant suggests that the State surreptitiously offered Smithey as an expert witness for future dangerousness. The trial court, however, did not even proceed with a *Daubert* motion at the time because the witness was not being offered as an expert for future dangerousness. We agree with the State and read the record as presenting Smithey as a fact witness regarding prison life and not as a predictor of behavior.

The appellant also argues on appeal that Smithey's testimony describing prison life was more prejudicial than probative.[66] This argument is not preserved for appeal, however, because

---

[65] *Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Cr. App. 2008) ("Smithee's [sic] testimony that inmate violence can occur under current prison conditions had some relevance to, and would have aided the jury in determining, appellant's future dangerousness.").

[66] R. EVID. 403.

the appellant did not make such an objection at trial. The appellant's argument regarding Smithey is overruled.

## B. Dr. Richard Coons

The appellant next posits that Dr. Richard Coons, the State's witness, was not qualified to testify as an expert witness as to future dangerousness. He contends that Dr. Coons's qualifications are insufficient to satisfy the *Daubert*, *Kelly,* and *Robinson* criteria for expert witnesses discussed in the appellant's fourth point of error.[67]

The evidence was that Dr. Coons held both a law degree and a medical degree, served in the United States Army Medical Corps, and was a consultant for the Brook Army Medical Center. He was certified by the Board of Psychiatry and Neurology, trained in neurology and psychiatry, and had been in private practice since 1975. Dr. Coons had evaluated approximately 8,000 people for competency to stand trial, and had consulted on 150 capital cases for either the prosecution or the defense.

In evaluating the appellant for the special issue on future dangerousness, Dr. Coons examined "twenty pounds of printed material and quite a number of CDs regarding statements" as well as offense reports, pictures, and educational records. While he did not personally interview the appellant, the Rules do not require an expert to complete personal interviews in order to make such determinations.[68] Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or

---

[67] Texas Rule of Evidence 702 contains three requirements for the admission of expert testimony: "(1) the witness must be qualified; and (2) the proposed testimony must be 'scientific . . . knowledge'; and (3) the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *See also Robinson*, 923 S.W.2d, at 556.

[68] *See Jordan v. State,* 928 S.W.2d 550, 556 (Tex. Cr. App. 1996).

inference may be those perceived by, reviewed by, or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

We find that the trial court did not abuse its discretion in finding Dr. Coons qualified as an expert witness with respect to future dangerousness.

We affirm the judgment of the trial court.

Delivered February 11, 2009.
Do not publish.