**Opinion issued August 1, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00327-CR

_____

**LARRY DEMETRICUS WOODRUFFE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Case No. 1617392**

---

## MEMORANDUM OPINION

Larry Demetricus Woodruffe appeals his conviction for capital murder of an individual under 10 years of age. *See* TEX. PENAL CODE §§ 19.03(a)(8); 19.02(b)(1). He was sentenced to life imprisonment without the possibility of parole.

On appeal, he contends that: (1) the evidence was insufficient to support his conviction; (2) the evidence was insufficient to corroborate accomplice-witness testimony; and the trial court erred in admitting testimony from two experts. We affirm.

## Background

Woodruffe was charged with capital murder for the death of J.B., a seven-year-old girl. He proceeded to a jury trial.

At trial, Woodruffe's accomplice Eric Black testified for the State.[1] He testified that in late December 2018, Woodruffe and Black sold drugs from Black's father's Cadillac at an apartment complex, as they typically did each day. On the day of the shooting, they "closed up shop" around 4 in the morning. Black drove Woodruffe and another man named "Qwain" away from the apartment complex. On the way to Qwain's residence, a silver Dodge Avenger pulled in front of the Cadillac. Black saw at least five men inside, and he recognized them as rival drug dealers, who had previously used social media to "slug," or threaten to kill, Black. Black was afraid they would shoot him and his companions. He ducked below the steering wheel and told Woodruffe and Qwain to get down. The rivals drove away without firing any shots. Black continued and dropped off Qwain.

---

[1] Black testified that in exchange for his testimony, the State agreed to cap his punishment at 35 years' imprisonment.

After Qwain was out of the car, Black and Woodruffe discussed retaliating against the rivals because, according to Black, they knew the rivals would try to "do something" to them in the future. Black and Woodruffe drove to Black's residence and switched vehicles. They left the Cadillac, and instead Black drove a silver Kia Sportage that his mother had recently rented. Black testified that he switched to the Kia because everyone in the neighborhood knew the Cadillac. Armed with a pistol, which Woodruffe held on his lap, the two men went to find the silver Dodge Avenger.

As Black drove out of the neighborhood around 6:30 in the morning, he saw a silver Dodge Avenger speeding down the street. Several people were inside, and Black believed that it was the same car that the rivals had driven. Black followed the Dodge Avenger, keeping a slight distance to avoid being noticed. After some time, Black drove the Kia in the lane next to the DodgeAvenger. The passenger side of the Kia was closest to the driver's side of the Dodge Avenger. As Black drove the Kia by the Dodge Avenger, Woodruffe lowered his passenger window, reached out of the car, and shot at the Dodge Avenger nine times. Several of the bullets struck the Dodge Avenger and its occupants. Black and Woodruffe drove away. Black took Woodruffe home. Later that day, Woodruffe picked up Black in a Chevy Malibu. Having switched cars again, they returned to the shooting scene. The Dodge Avenger was draped in a white sheet, indicating to Black that someone

3

had died. Black became nervous, and he and Woodruffe circled the area about three times before going home.

Unbeknownst to Black or Woodruffe, the Avenger was not occupied by the rival drug dealers. Instead, LaPorsha Washington was driving the car and her four young daughters were inside. Washington testified that the first thing that caught her attention was her driver's side window glass shattering. She did not know what happened, but she knew she was hurt. She called out to each of her daughters to make sure they were okay. J.B., her seven-year-old daughter, did not respond. One of the bullets hit J.B. in the head and killed her almost instantly. Another bullet hit Washington's left shoulder and grazed the neck of U.B., who was sitting in the rear middle seat. Washington realized she had been shot and that J.B. was unresponsive.

Washington began driving toward a hospital and told her children to call 911. She was forced to pull over because the Dodge Avenger was damaged and had a flat tire, and because she was bleeding profusely and struggling to stay conscious. Two of Washington's daughters got out of the car and began frantically waving their arms to flag a passing motorist for help. A man stopped and stayed with the panicked children until the police and paramedics arrived. The man testified that the two children begged him to take their mother to the hospital. He called 911, and a recording of the call was played for the jury. When emergency

4

personnel arrived, Washington and the daughter shot in the neck were transported to the hospital. Washington testified that a bullet remains lodged in her arm.

A.D., Washington's then-fourteen-year-old daughter, testified that she and her sister E.D. spoke to investigators.[2] They believed that the shooter was a white man driving a truck. Right before the shooting, when the Dodge Avenger was at a stoplight near a Walmart, the truck had been near their car. A.D. told investigators that the driver was a Caucasian man wearing a hoodie. Once they passed Walmart, A.D. heard loud popping noises. A.D. testified that she never saw another car on the road. A few days later, investigators arranged for A.D. and E.D. to meet with a forensic sketch artist. The sketch artist prepared a drawing of the potential suspect based on the girls' description.

Investigators from the Harris County Sherriff's Department testified regarding their initial response and investigation. Investigators collected evidence from the scene, including seven fired cartridge cases found on the frontage road. They also obtained and reviewed surveillance videos from nearby businesses. The sketch created from A.D. and E.D.'s recollections was distributed to local media outlets and agencies. Law enforcement received hundreds of tips but no leads. A few days later, Woodruffe's ex-girlfriend's cousin called the Harris County Sheriff's Office to report a tip that Woodruffe and someone with the initials "E.B."

---

[2] E.D. also testified to similar details as A.D.

had committed the murder in a rented SUV. The tipster provided a photograph of Woodruffe.[3] The detective identified Woodruffe in court as the same person in the photograph.

Investigators used the tip to research on social media and learn Black's full name. They also contacted local car rental agencies and found the silver Kia Sportage rented by Black's mother. After watching surveillance videos, investigators noticed that a silver vehicle, consistent with a Kia Sportage, was seen following Washington's Dodge Avenger right before the shooting. The surveillance video was shown to the jury. It showed a red truck near the scene but veering off in the other direction to enter the highway. An investigator testified that it would have been nearly impossible for shell casings to have been shot from the highway and be found on the frontage road. The video then showed a silver vehicle near Washington's car.

Law enforcement arrested Black for a traffic offense and brought him to the police station for an interview. Black initially denied any knowledge or involvement with the shooting to investigators. During the interrogation, he eventually admitted that he and Woodruffe committed the crime, and he named

---

[3]     A detective testified that the tipster received a financial reward from a private organization in exchange for information about the crime.

Woodruffe as the shooter.[4] He told detectives that the weapon was hidden under his mattress, and he gave permission for investigators to search his bedroom and retrieve it. Investigators found the weapon exactly where Black described that it would be.

Black also gave investigators consent to search his cellphone, and they found Woodruffe's phone number in Black's phone. Investigators obtained a search warrant for Woodruffe's cellphone records. Investigators discovered text messages and phone calls between Black and Woodruffe after the shooting. The text messages included Woodruffe assuring Black, "We good," when Black commented that there were many police officers in the area after the shooting.

A DNA analyst with Harris County Institute of Forensic Scientists testified that he reviewed DNA swabs related to the case. There was strong support for both Black and Woodruffe as contributors to DNA found on the gun. Woodruffe's DNA was also found on the passenger side of Black's father's Cadillac.

After a hearing on her qualifications and over Woodruffe's objection, a firearms examiner, Tammy Lyons, testified about her analysis of recovered fired projectiles and cartridge casings. She explained tool mark identification theory, stating that firearms leave unique mark impression on bullet casings and bullets. In

---

[4] Black also identified Woodruffe in court as the shooter.

her opinion, the cartridge casings recovered from the scene contained marks from the firearm recovered at the scene.

Over Woodruffe's objection, FBI Agent Sedgwick testified as an expert regarding the location of Woodruffe's and Black's cellphones at the time of the shooting. Agent Sedgwick was part of the FBI's Cellular Analysis Survey Team ("CAST"). He opined on each phone's location by studying historical phone records from service providers. He compared the phone records to a list of cellphone tower locations. Woodruffe's and Black's phones had been near each other before and during the shooting. The phones were in the vicinity of the crime scene at the time of the shooting.

The jury found Woodruffe guilty of capital murder, and the court sentenced him to life imprisonment. He appeals.

## Sufficiency of the Evidence

In his first issue on appeal, Woodruffe contends that the evidence presented at trial was insufficient to support his conviction for capital murder. Specifically, he argues that the evidence to prove his identity as the shooter was insufficient because Washington's daughters told investigators that someone who did not match Woodruffe's description was the assailant.

## A.      Standard of Review

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial." *Id.* Juries are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence." *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence. *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)); *see also Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("Identity of a perpetrator can be proved by direct or circumstantial evidence; eyewitness identification is not necessary."). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of

the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). Appellate courts must also bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the Texas Penal Code, a person commits the offense of capital murder "if the person commits murder" and the person murders an individual under 10 years of age. TEX. PENAL CODE § 19.03(8). A person commits murder if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1).

10

**B.    Analysis**

Black identified Woodruffe as the shooter to investigators shortly after the murder and in court during trial. Black testified that early in the morning on December 30, 2018, he drove Woodruffe and another friend named "Qwain" to each of their homes, after their typical day of drug-dealing from Black's father's Cadillac. While on the drive, they encountered rival drug dealers in a silver Dodge Avenger. The rivals pulled in front of Black's Cadillac and lowered their windows. Black thought they were going to shoot him. He ducked and told Qwain and Woodruffe to get down. The rivals had previously "slugged" Black on Twitter, meaning they had threatened to kill him. The rivals drove away without shooting.

Black drove Qwain home and then he and Woodruffe discussed finding the rivals and retaliating. According to Black, he and Woodruffe knew the rivals would come for them at some point. They waited for Qwain to get out of the car because they did not think he would keep their plan a secret. Black drove to his house and traded his father's Cadillac for a rented silver Kia Sportage. Black drove, and Woodruffe rode in the passenger seat with a gun in his lap.

Shortly after leaving their neighborhood, they saw a silver Dodge Avenger with several occupants speeding down the street. They thought it was the same car that the rival drug dealers had been driving. They followed the car on the frontage road of Beltway 8, keeping a distance so that the car would not see them. Near a

Walmart, they closed in on the silver car, passing it on its left. Woodruffe extended himself out of the front passenger window and fired nine rounds at the Dodge. Black knew that some of the shots hit the car because it swerved, and he could hear the tires "scratching."

Black drove Woodruffe home and then proceeded to his own house, where he changed clothes and hid the gun under his mattress. Woodruffe soon picked up Black in a Chevy Malibu. Having switched cars again, they returned to the shooting scene to see if they had been successful. The Dodge Avenger was draped in a white sheet, indicating to Black that someone had died. Black became nervous, and he and Woodruffe circled the area about three times before going home. Black soon learned that they had shot at the wrong car, killing a little girl.

In addition to his in-court identification of Woodruffe as the shooter, Black also told homicide investigators that Woodruffe was the shooter. Black gave consent to the investigators to search and download information from his cellphone and to retrieve the gun from beneath his mattress. Investigators discovered text messages and phone calls between Black and Woodruffe after the shooting. The text messages included Woodruffe assuring Black, "We good," when Black commented that there were many police officers in the area after the shooting.

A homicide investigator testified that a few days after the shooting, Woodruffe's ex-girlfriend's cousin called in a tip that Woodruffe and someone

with the initials "E.B." had committed the capital murder. The tip included a photograph of Woodruffe and mentioned the fact that Woodruffe and Black were driving a rented SUV during the shooting. Homicide investigators then located a rented Kia Sportage at an Avis rental agency. It had been rented to Black's mother. Woodruffe's DNA was found on the murder weapon and on Black's father's Cadillac. A firearms examiner matched the recovered bullet casings to the weapon found under Black's mattress.

An FBI agent testified that he had reviewed Black's and Woodruffe's cellphone records. The records revealed that the phones were in proximity to each other immediately before and during the time of the shooting. The phones were also in the vicinity of the crime scene at that time.

Woodruffe argues that the evidence is insufficient as to identity because two of J.B.'s sisters did not identify him as the shooter at the time of the offense or at trial. The sisters each testified that originally, they thought the shooter was a white man wearing a hoodie who had been driving a red truck near their car just before the shooting. The sisters gave a description of this person to police in the hours after the shooting. The fact that the sisters initially described someone that did not fit Woodruffe's description as the perpetrator does not render the evidence against Woodruffe legally insufficient. *See Arrellano v. State*, 555 S.W.3d 647, 651 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (inconsistencies in witnesses'

testimony and description of the circumstances do not render evidence legally insufficient); *see also Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (inconsistencies between complainant's and investigating officer's testimony do not render evidence legally insufficient). Moreover, the State presented testimony showing that the red truck had veered away from J.B.'s family's vehicle to enter the highway before the shooting. The jury watched the video showing the truck entering the highway and showing a Kia car near Washington's Avenger. We presume that the jury weighed the evidence and resolved any inconsistencies in favor of the verdict. *See Merritt*, 368 S.W.3d at 525–26. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found, beyond a reasonable doubt, that Woodruffe committed capital murder when he shot and killed J.B.

We overrule Woodruffe's challenge to the sufficiency of the evidence.

## Accomplice-Witness Testimony

In his second issue, Woodruffe contends that there is insufficient evidence to corroborate Black's accomplice-witness testimony. We disagree.

## A.    Standard of Review and Relevant Law

An accomplice is a person who participates with a defendant in the charged offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "A conviction cannot

14

be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14.

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon* v. *State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). We view corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). If there are two views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *Smith*, 332 S.W.3d at 442. "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.*

"[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. Nor is it necessary "that the corroborating evidence directly connect the defendant to the crime[.]" *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Instead, the corroborating evidence must only link the defendant in some way to the commission of the crime

15

and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). The corroborating evidence need only "connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) ("The corroboration requirement in Article 38.14 does not apply separately to each element of the offense charged or to each aspect of the accomplice's testimony.").

Although a defendant's mere presence at the scene of the crime, by itself, is not sufficient to corroborate accomplice testimony, such evidence "when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Malone*, 253 S.W.3d at 257 (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). The corroborating evidence may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442. "If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of Article 38.14 has been fulfilled." *Cathey*, 992 S.W.2d at 462.

**B.      Sufficient evidence corroborates Black's testimony and connects Woodruffe to the offense.**

The State presented sufficient evidence to corroborate Black's accomplice-witness testimony and connect Woodruffe to the capital murder. Woodruffe's ex-

girlfriend's cousin reported a tip to police, stating that Woodruffe committed the murder along with someone named "E.B." The cousin provided a photograph of Woodruffe and stated that the two men committed the crime in the rented car. Investigators found the Kia at a rental agency and learned it had been rented by Black's mother. Cellphone tracking evidence established that Woodruffe and Black were together before, during, and after the shooting. The evidence also established that they traveled along the route that Black described. They were in the vicinity of the crime scene at the time of the shooting.

The State presented surveillance videos from nearby businesses that showed a silver Kia following a silver Dodge Avenger prior to the shooting. The trajectory of bullet strikes was consistent with Black's testimony that he was driving the Kia to the left of the Avenger and that Woodruffe leaned out the window as he repeatedly shot at the sedan. When Black expressed concern about police presence, Woodruffe sent Black a text message in the hours after the shooting assuring him, "We good." Woodruffe's DNA was found on the murder weapon and investigators found seven fired cartridge casings on the side of the road. This is consistent with Black's account that Woodruffe shot at the other car nine times. Investigators also determined that all the recovered casings had been fired from the gun found in Black's house, supporting that there was only one shooter.

This independent evidence corroborates Black's accomplice-witness testimony and connects Woodruffe to the capital murder. *See Joubert*, 235 S.W.3d at 731. There was sufficient evidence to corroborate Black's accomplice-witness testimony.

We overrule Woodruffe's second issue.

## Expert Witnesses

In his third and fourth issues, Woodruffe contends that the trial court abused its discretion in admitting expert testimony. First, he argues that the court erred in admitting testimony from Tammy Lyons, a firearms examiner, concerning her analysis of recovered fired projectiles and cartridge casings. He contends that the State did not show that Lyons was qualified as an expert in her field and that the State did not show that Lyons's expert testimony was reliable. Second, he argues that the trial court abused its discretion by admitting expert testimony of Agent Sedgwick regarding his analysis of cellphone records from Black and Woodruffe. Woodruffe argues that Sedgwick's testimony was unreliable because he "could not vouch for the accuracy of the information because he was not with the carrier."

### A. Standard of Review

An appellate court reviews a trial judge's decision to admit or exclude scientific expert testimony for an abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542–43 (Tex. Crim. App. 2000). "The trial court hearing is the main

event for *Daubert/Kelly* gatekeeping hearings; it is not a try-out on the road to an appellate scientific seminar." *Hernandez v. State*, 116 S.W.3d 26, 30 (Tex. Crim. App. 2003). If the trial judge's ruling is within the zone of reasonable disagreement, then it will be upheld. *Sexton v. State*, 93 S.W.3d 96, 99–100 (Tex. Crim. App. 2002).

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Under Rule 702, the trial judge determines whether the proffered scientific evidence is sufficiently reliable and relevant to aid the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000); *see also Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993). Reliability refers to the scientific basis for the testimony, while relevance refers to the "fit" of the scientific principles to the evidence. *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013).

The proponent of the scientific evidence must demonstrate through clear and convincing evidence that the evidence is in fact reliable. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The proponent meets this burden by showing that: "(1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in

question." *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012). Some factors that might influence a trial judge's determination of reliability include: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the existence of literature supporting or rejecting the underlying scientific theory and technique; (3) the clarity with which the underlying scientific theory and technique can be explained to the court; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the qualifications of the expert(s) testifying; and (7) the experience and skills of the person(s) who applied the technique on the occasion in question. *Sexton*, 93 S.W.3d at 100.

**B.    Analysis**

    **1.    Firearms expert**

        **(a)    Woodruffe did not preserve his complaint that Lyons was unqualified.**

Woodruffe complains on appeal that Lyons was unqualified to testify as an expert. This argument does not comport with his objections in the trial court, so it is not preserved. *See* TEX. R. APP. P. 33.1.  In the trial court, Woodruffe objected only that the field of firearms examination was unreliable, untestable science. He did not preserve his complaint regarding Lyons personally.

### (b) The trial court did not abuse its discretion in finding Lyons's testimony reliable.

Woodruffe also challenges the reliability Lyons's testimony, Lyons's methodology, and Lyons's opinions based on her comparisons. Lyons's testimony established that theory of firearm identification and the technique of microscopic firearm and toolmark comparison are valid and accepted by the relevant scientific community. She testified that using toolmark theory to identify and compare fired projectiles and cartridge casings to each other and to a known firearm dates back at least 90 years. Lyons testified that she had extensive qualifications, including multiple certifications and licenses, years of training and course study, years of practical professional experience, and annual proficiency testing. She testified that she has always passed her proficiency tests, which happen at random and are sometimes blind, meaning she does not know that the work she is doing is a proficiency test as she takes it. Lyons described numerous studies of firearm barrels and slides that validate the theories underlying her ability to accurately compare fired projectiles and casings to firearms. Regarding her own work, Lyons testified that pursuant to quality control protocol, her firearm analysis and conclusions are independent verified by a second firearms examiner. Lyons stated that she has testified as a firearms examination expert on many occasions.

Woodruffe argues that Lyons did not testify as to whether she has authored articles or literature on tool mark examination nor did she testify to the number of

times she had previously testified as an expert. Neither is required to qualify as an expert. *See Wolfe v. State*, 509 S.W.3d 325, 335–37 (Tex. Crim. App. 2017) (giving nonexclusive list of factors that might influence trial court's reliability finding); *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) ("The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed. The reliability inquiry is, thus, a flexible one."). "The trial court's gatekeeping function under Rule 702 does not supplant cross-examination as the traditional and appropriate means of attacking shaky but admissible evidence." *Wolfe*, 509 S.W.3d at 336 (internal citations and quotations removed). The trial court did not abuse its discretion in determining that Lyons's testimony had a reliable, scientific foundation.

We overrule Woodruffe's issue related to the reliability of Lyons's testimony as an expert.

### 2. The trial court did not abuse its discretion in admitting testimony from a cellphone mapping expert.

Woodruffe also challenges the reliability of FBI Agent Sedgwick's expert testimony regarding call detail record mapping. Woodruffe argues that the trial court abused its discretion in finding Sedgwick's opinion reliable because Sedgwick did not know the algorithms that carriers use to provide data and because carriers issue a disclaimer regarding the accuracy of the information they provide.

22

The State called Agent Sedgwick as an expert to testify on the approximate location of Woodruffe's and Black's cellphones around the time of the shooting. At the hearing regarding Sedgwick's qualifications to opine on these subjects, Sedgwick testified that he is a certified expert in the analysis of historical call detail records and has numerous qualifications as part of the FBI's CAST agent team. He has over 400 specialized training hours and training in reading records from multiple cellular providers. He has used this experience to track the location of cellphones, to locate kidnapping victims, missing people, and fugitives. Sedgwick receives annual training in his field and undergoes routine proficiency recertification, which he always passes.

Sedgwick explained that he can determine that a cellphone was within a certain distance from a cellphone tower, but he cannot state the specific address where a device is located at a particular time. Sedgwick applied this technique and his training to determine the locations of Woodruffe's and Black's cellphones around the time of the shootings. His conclusions were reviewed by another CAST agent.

Woodruffe argues that Sedgwick's lack of knowledge of the cellphone's proprietary software makes his testimony unreliable, but Sedgwick's testimony and analysis pertained only to the straightforward task of mapping the two cellphones relative to the towers that those devices used. *See Ward v. State*, No. 14-15-00473-

CR, 2016 WL 6238339, at *10 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op., not designated for publication) (stating knowledge of proprietary software not relevant to straightforward mapping cellphone location based on location of towers). Sedgwick's training and experience were on the exact subject about which he was asked to testify during Woodruffe's trial. He testified regarding how cellphones connect with cell towers and the areas served by each cell tower. We conclude the trial court did not abuse its discretion when it determined Sedgwick was qualified to testify as an expert and in determining his opinion on the general location of the two cellphones around the time of the shooting was reliable. *See id.*

We overrule Woodruffe's issue related to the admissibility of expert testimony.

## Conclusion

We affirm the judgment of the trial court.

Peter Kelly
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).